IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION

| | | |
|---|---|---|
| KLEIN INDEPENDENT SCHOOL DISTRICT, | § § § | |
| Plaintiff/Counter-Defendant and | § § | |
| TEXAS EDUCATION AGENCY, | § § | |
| Defendant, | § § | |
| VS. | § § | CIVIL ACTION H-09-137 |
| PER HOVEM, KNUT HOVEM AND SIGNE HOVEM, | § § § | |
| Defendants/Counter-Plaintiffs. | § | |

**OPINION AND ORDER**

Pending before the Court in the above referenced cause, grounded in the Individuals with Disabilities Education Act ("IDEA"), 20 U.S.C. § 1415(i)(2)(A),[1] appealing Texas Education Agency ("TEA") Special Education Hearing Officer Tomas Ramirez, III's decision[2] that Klein Independent School District ("KISD") failed to provide student Per Hovem with a free appropriate public

_____

[1] The IDEA's purpose is "to ensure that all children with disabilities have available to them a free appropriate public education that emphasizes special education and related services designed to meet their unique needs and prepare them for further education, employment, and independent living."  20 U.S.C. § 1400(d)(1)(A).

[2] Admin. Rec. (filed in two volumes as instrument #9), Vol. 1, at 4-29.

education[3] and ordering Plaintiff/Counter-Defendant KISD to reimburse the Hovems for past and future educational expenses incurred by them at a private residential facility located in Massachusetts, are (1) KISD's motion for summary judgment (#17) and (2) the Hovems' motion for judgment upon the administrative record (#39).

After careful review of the administrative record, the parties' briefs, and the applicable law, and after considerable thought, the Court finds from a preponderance of the evidence in the administrative record, for reasons explained below, that the Hearing Officer's Decision should be affirmed in part and reversed in part and the Hovems' motion for judgment should be granted with regard to KISD's failure to provide Per with a FAPE and to reimbursement for educational expenses, but not for residential expenses, incurred by Per at Landmark School.

## Standard of Review

**Summary Judgment Under the IDEA:   Review of Hearing Officer's Decision**

When addressing a summary judgment under the IDEA appealing a hearing officer's decision, the court reviews the administrative

---

[3] In *Per H. b/n/f Knut and Signe H. v. Klein Indep. Sch. Dist.*, Docket No. 265-SE-0608, the hearing officer held that KISD denied Per a free appropriate public education ("FAPE") and ordered KISD to reimburse his parents for the expenses they incurred in placing him in a residential program in the private Landmark School in Massachusetts.  #9, Admin. Rec., Vol. I, pp. 4-28.

record of the due process hearing and examines new evidence at the request of any party. *HISD v. V.P. ex rel. Juan P.*, 582 F.3d 576 (5th Cir. 2009), *cert. denied*, 130 S. Ct. 1892 (2010)(No. 09-841); *Cypress-Fairbanks ISD v. Michael F.*, 118 F.3d 245, 252 (5th Cir. 1997)(*citing Bd. of Educ. of Hendrick Hudson Central Sch. Dist. v. Rowley*, 458 U.S. 176, 206 (1982), *cert. denied*, 522 U.S. 1047 (1998)), *cert. denied*, 522 U.S. 1047 (1998). When no new evidence is presented to the district court in an IDEA suit, . . . "the motion for summary judgment is simply the procedural vehicle for asking [the judge] to decide the case on the basis of the administrative record." *El Paso ISD v. Richard R.*, 567 F. Supp. 2d 918, 927 (W.D. Tex. 2008), *citing Heather S. v. State of Wis.*, 125 F.3d 1045, 1052 (7th Cir. 1997). *See also D.C. v. Klein ISD*, ___ F. Supp. 2d ____, Civ. A. No. H-09-1714, 2010 WL 1798943, *4 (S.D. Tex. May 5, 2010), *citing Loch v. Edwardsville School Dist. No. 7*, 327 Fed. App'x 647, 650 (7th Cir. 2009); *Capistrano Unified Sch. Dist. v. Wartenberg*, 59 F.3d 884, 892 (9th Cir. 1995)("Though the parties [in an IDEA action] may call the procedure 'a motion for summary judgment' . . . the procedure is in substance an appeal from an administrative determination, not a summary judgment."). "Thus even though it is termed 'summary judgment,' the district court's decision is based on the preponderance of the evidence." *Loch*, 327 Fed. App'x at 650. Therefore the existence of a disputed issue of material fact will not defeat such a motion for summary

judgment. 20 U.S.C. § 1415(i)(2)(C). The parties here have not submitted any new evidence, so this Court's review of the Hearing Officer's decision will therefore be based on the administrative record below.[4]

While the court must give the hearing officer's findings "due weight," it must make an independent, "virtually *de novo*" decision based on preponderance of the evidence before it. 20 U.S.C. § 1415(i)(2)(C); *Michael F.*, 118 F.3d at 252. In applying the "due weight" standard, "the hearing officer's findings are not conclusive and the court may take additional evidence and reach an independent conclusion based on the preponderance of evidence." *Teague ISD v. Todd L.*, 999 F.2d 127, 131 (5th Cir. 1993). Furthermore the district court does not have to defer to the hearing officer's findings "when its own review of the evidence indicates that the hearing officer erroneously assessed the facts or erroneously applied the law to the facts." *Id.* The *Teague* appellate panel quoted *Rowley*:

> "Congress expressly rejected provisions that would have . . . severely restricted the role of reviewing courts. In substituting the current language of the statute [20 U.S.C. § 1415(e)(2)] for language that would have made state administrative findings conclusive if supported by substantial evidence, the Conference Committee explained

---

[4] Because many of the exhibits of the Hovems (Petitioners at the Due Process Hearing) and KISD (Respondent) are duplicates, the Court emphasizes that its selection of one or the other for citation in no way indicates a preference for the arguments of one party over the other; the Court has simply selected the one closest as hand at the time.

> that courts were to make 'independent decision[s] based
> on a preponderance of the evidence.'"

999 F.2d at 131, *quoting Rowley*, 458 U.S. at 205 (quoting S. Cong.
Rec. 37416 (1975)(remarks of Sen. Williams)).  Nevertheless this
preponderance-of-the-evidence standard is not "an invitation to the
courts to substitute their own notion of sound educational policy
for those of the school authorities which they review."  *Rowley*,
458 U.S. at 206.  "The primary responsibility for formulating the
education to be accorded to a handicapped child, and for choosing
the educational method most suitable to the child's needs, was left
by the Act to state and local educational agencies in cooperation
with the parents or guardian of the child."  *Id*. at 207.

While the court reviews a mixed question of fact and law *de
novo*, "the underlying fact-findings, 'such as finding that a
disabled student obtained educational benefits under an
[individualized education program ("IEP")],[5] are reviewed for clear

_____

[5] Under the IDEA, in providing every child with disabilities
a FAPE, each school district receiving federal funds must develop
and implement an individualized education program ("IEP") for each
disabled student.

In Texas, the Admissions, Review and Dismissal Committee ("ARD
Committee") is responsible for preparing the IEP.  *Cypress-
Fairbanks Indep. Sch. Dist. v. Michael F.*, 118 F.3d 245, 247 (5th
Cir. 1997), *cert. denied*, 522 U.S. 1047 (1998).  The ARD Committee
should be composed of the parents of the child with a disability,
at least one of the child's regular education teachers, at least
one special education teacher, a qualified representative of the
school district, an individual who is able to "interpret 'the
instructional implications of evaluation results,'" others, at the
discretion of the parents or agency, who have knowledge or special
expertise regarding the child, and when appropriate, the child.
*HISD v. V.P. ex rel. Juan P.*, 582 F.3d at 580 n.1.

error.'"   *HISD v. Bobby R.*, 200 F.3d 341, 347 (5th Cir. 2000)(*quoting Cypress-Fairbanks*, 118 F.3d at 252), *cert. denied*, 531 U.S. 817 (2000).  "A finding of fact is clearly erroneous when, although there is evidence to support it, the reviewing court based on all the evidence is left with the definitive and firm conviction that a mistake has been committed." *Houston Exploration Co. v. Halliburton Energy Servs., Inc.*, 359 F.3d 777, 779 (5th Cir. 2004).

**The IDEA**

The Fifth Circuit has held that the IDEA creates a presumption in favor of the school district's IEP. *White ex rel. White v. Ascension Parish Sch. Bd.*, 343 F.3d 373, 377 (5th Cir. 2003). Therefore the party challenging the appropriateness of an IEP during the due process hearing bears the burden of showing why the IEP and resulting placement were inappropriate under the statute. *Id.; Schaffer v. Weast*, 546 U.S. 49, 57-58 (2003)(In an administrative hearing under the IDEA, the burden of persuasion is properly placed on the party seeking relief, the plaintiff); *Bobby R.*, 200 F.3d at 347.  *See also White*, 343 F.3d at 377, *citing Teague ISD v. Todd L.*, 999 F.2d 127, 132 (5th Cir. 1993); *Michael F.*, 118 F.3d at 252.  The Fifth Circuit has further held that "at

---

The IEP is a written statement prepared for implementation by the child's ARD Committee to address the child's individual and unique needs, based on assessments of and performance by the child. The IEP must provide "a basic floor of opportunity" that consists of "access to specialized instruction and related services which are individually designed to provide educational benefit to the [disabled] child." *Rowley*, 458 U.S. at 201.

the district court level, as at the administrative level, the party challenging the IEP bears the burden of showing that the IEP and the resulting placement are inappropriate under the IDEA." *Richardson ISD v. Michael Z.*, 580 F.3d 286, 292 n.4 (5th Cir. 2009). Thus the Hovems still bear the burden of persuasion here.

A central goal of the IDEA is to make sure that children with disabilities "receive a 'free appropriate public education ["FAPE"][6] that emphasizes special education and related services

_____

[6] In *Rowley*, 458 U.S. at 188, Justice Rehnquist, writing for the majority, pointed out the IDEA's express definition of FAPE:

> "The term 'free appropriate education' means *special education* and *related services* which (A) have been provided at public expense, under public supervision and direction, and without charge, (B) meet the standards of the State educational agency, (C) include an appropriate preschool, elementary, or secondary education in the State involved, and (D) are provided in conformity with the individualized education program required under section 1414(a)(5) of this title. § 1401(18) (emphasis added).

The opinion continues,

> "Special education," as referred to in this definition, means "specially designed instruction," at no cost to parents or guardians, to meet the unique needs of a handicapped child, including classroom instruction, instruction in physical education, home instruction, and instruction in hospitals and institutions." § 1401(16). "Related services" are defined as "transportation, and such developmental, corrective and other supportive services as may be required to assist a handicapped child to benefit from special education." § 1401(17).

*Id.* Justice Rehnquist continued, "Examples of related services' identified in the Act are 'speech pathology and audiology, psychological services, physical and occupational therapy, recreation, and medical and counseling services, except that such

designed to meet their unique needs and prepare them for further education, employment, and independent living.'" *Houston ISD v. V.P. ex rel. Juan P.*, 582 F.3d at 583.   KISD, as "'a local educational agency responsible for complying with the IDEA as a condition of the State of Texas' receipt of federal education funding' . . . must '(1) provide each disabled child within its jurisdictional boundaries with a 'free appropriate public education' tailored to his unique needs, and (2) assure that such education is offered . . . in the least restrictive environment consistent with the disabled student's needs.'"   *Id., citing Michael F.*, 118 F.3d at 247.   The school district does not have to

---

medical services shall be for diagnostic and evaluation purposes only.'"   *Id.*, n. 10, citing § 1401(17).

    Studying the legislative history of the IDEA, in 1982 the United States Supreme Court, pointing out that "[n]oticeably absent from the language of the statute is any substantive standard prescribing the level of education to be accorded handicapped children," opined that "Congress did not impose upon the States any greater substantive educational standard than would be necessary to make such access meaningful."   *Id.* 192.   It concluded that "Congress sought primarily to make public education available to handicapped children": "Thus, the intent of the Act was more to open the door of public education to handicapped children on appropriate terms than to guarantee any particular level of education once inside."   *Rowley*, 458 U.S. at 189, 192.   The Supreme Court determined that "[T]he 'basic floor of opportunity' provided by the Act consists of specialized instruction and related services which are individually designed to provide educational benefit to the handicapped child," not to maximize the potential of each handicapped child commensurate with the opportunity provided non-handicapped children.   *Id.* at 200-01.   The Supreme Court further observed that the State satisfies the requirement to provide a handicapped child with a publically funded FAPE "by providing personalized instruction with sufficient support services to permit the child to benefit educationally from that instruction."   *Id.* at 203.

"provide its disabled students with the best possible education, nor one that will maximize the student's educational potential." *Id., citing Michael F.*, 118 F.3d at 247 (*citing Rowley*, 458 U.S. at 188-89). "'Nevertheless, the educational benefit to which the Act refers and to which an IEP must be geared cannot be a mere modicum or *de minimis*; rather, an IEP must be likely to produce progress, not regression or trivial educational advancement'"; in other words, KISD must provide its disabled students with "'meaningful' educational benefit." *Id., citing Michael F.*, 118 F.3d at 248. The decision whether a local district's IEP was appropriate under the IDEA is a mixed question of law and fact. *Michael F.*, 118 F.3d at 252.

The IEP is the centerpiece of and the primary vehicle for effecting Congressional goals under the IDEA. *Honig v. Doe*, 484 U.S. 305, 311 (1988). The IEP "sets out the disabled child's present educational performance, establishes annual and short-term objectives for improvements in that performance, and describes the specially designed instruction and services that will enable the child to meet those objectives." *Id.*, citing § 1401(9). It must be reviewed at least annually and revised where necessary to ensure that the school district tailors the statutorily mandated FAPE to the child's unique needs. *Id., citing* § 1414(a)(5). Parental participation is essential in the development and subsequent assessments of the IEP's effectiveness. *Id.* Therefore the Act

establishes   procedural   safeguards   to   guarantee   parents   the
opportunity  for  meaningful  input  into  all  decisions  about  their
child's education and the right to request review of any decisions
they consider inappropriate.  *Id.*  Examples include the right to
examine  all  relevant  records  relating  to  the  identification,
evaluation and educational placement of the child; participation in
meetings  concerning  the  child's  educational  placement;  right  to
obtain  an  independent  educational  evaluation  of  the  child;  prior
written  notice  of  any  agency  proposal  to  change  the  child's
placement or program; an opportunity to make any complaints about
the  agency's  actions;  and  the  right  to  an  impartial  due  process
hearing for any such complaints.[7]  20 U.S.C. § 1415(b); *Id.* at 311-
12.  If issues still have not been resolved, the educational agency
and the parents each have the right to seek further administrative
review, and subsequently if still necessary, file a civil action in
state or federal court.  *Id.* at 312, *citing* §§ 1415(c) and (e)(2).

---

[7] Under the IDEA a parent or guardian of a disabled child may
file  a  complaint  "with  respect  to  any  matter  relating  to  the
identification,  evaluation,  or  educational  placement  of  the  child,
or  the  provision  of  a  free  appropriate  public  education  to  such
child."   Such  a  complaint  results  in  an  impartial  due  process
hearing,  conducted  according  to  state  law.    20  U.S.C.  §
1415(f)(1)(A).    In  Texas,  a  Special  Education  Hearing  Officer
conducts the hearing under the watch of the TEA.  89 Tex. Admin.
Code  §  89.1151;  34  C.F.R.  §§  300.504-15.    Thereafter,  a  party
"shall  have  the  right  to  bring  a  civil  action  .  .  .  in  any  State
Court  of  competent  jurisdiction  or  in  a  district  court  of  the
United  States,  without  regard  to  the  amount  in  controversy."    20
U.S.C. § 1415(i)(2)(A).  *See generally Michael Z.*, 561 F. Supp. 2d
at 592-93.

When a parent contests the appropriateness of an IEP, or whether the school district provided the student with disabilities a FAPE, the district court should follow a two-step review, the first procedural, the second substantive: (1) it must determine whether the state complied with the IDEA's procedural requirements, and (2) decide whether the IEP was "'reasonably calculated to enable the child to receive educational benefits.'" *Juan P.,* 582 F.3d at 583-84, *citing Rowley*, 458 U.S. at 206-07.

For the substantive prong of the *Rowley* test, the Fifth Circuit considers four factors as "indicators of whether an IEP is reasonably calculated to provide a meaningful educational benefit under the IDEA": whether "(1) the program is individualized on the basis of the student's assessment and performance; (2) the program is administered in the least restrictive environment[8]; (3) the services are provided in a coordinated and collaborative manner by

_____

[8] Title 20 U.S.C. § 1412(a)(5)(A) states,

To the maximum extent appropriate, children with disabilities . . . [should be] educated with children who are not disabled, and special classes, separate schooling, or other removal of children with disabilities from the regular educational environment [should occur] only when the nature or severity of the disability of a child is such that education in regular classes with the use of supplementary aids and services cannot be achieved satisfactorily.

As quoted by *Juan P.*, 582 F.3d at 585-86 (observing the IDEA's strong preference in favor of mainstreaming must be weighed in tandem with the Act's main goal of ensuring that a child be provided with a FAPE. 20 U.S.C. § 1412(a)(5)(A).)

the key 'stakeholders'; and (4) positive academic and non-academic benefits are demonstrated."[9]  *Juan P.*, 582 F.3d at 584, *citing Michael F.*, 118 F.3d at 253.  "[T]hese factors are . . . intended to guide a district court in the fact-intensive inquiry of evaluating whether an IEP provided an educational benefit," and the court does not err in affording more or less weight to one than the other.  *Michael Z.*, 580 F.3d at 294.

A party challenging implementation of the IEP must show that the "school board or other authorities failed to implement substantial or significant provisions of the IEP"; the failure of the local education agency "to provide all the services and modifications in an IEP does not constitute a *per se* violation" of the statute.  *Bobby R.*, 200 F.3d at 349.  Nor is it necessary for the handicapped student to improve in *every* area to obtain educational benefit from his IEP.  *Id.* at 350.  School districts are not required to cure or erase the differences between disabled and non-disabled children, but only to develop an individualized program capable of providing an educational benefit to the child. *D.B. ex rel. C.B. v. Houston ISD*, No. Civ. A. H-06-354, 2007 WL 2947443, *11 (S.D. Tex. Sept. 29, 2007), *citing Daniel R.R. v. State Bd. of Educ.*, 874 F.2d 1036, 1047 (5th Cir. 1989); *Rowley*, 458

---

[9] KISD argues that the Hearing Officer confused the *Rowley* test by conflating the two prongs and characterizing KISD's failures as procedural, but then concluding that Per was deprived of an educational benefit from his IEP.

U.S. at 200-01 ("the intent of the Act was more to open the door of public education to handicapped children on appropriate terms than to guarantee any particular level of education once inside."). Moreover while the school district and experts may disagree over the diagnosis of a student's disability, "[t]he IDEA charges the school with developing an appropriate education, not with coming up with a proper label with which to describe [the child's] multiple disabilities." *Heather S. v. Wisconsin*, 125 F.3d 1045, 1055 (7th Cir. 1997).

Eligibility under the IDEA terminates with the earlier of high school graduation or the student's twenty-first birthday.  20 U.S.C. § 1412(1)(a)(2005).

The statute of limitations for a parent or school district to file for a due process hearing under the IDEA is found in 20 U.S.C. § 1415(f)(3)(C)[emphasis added by the Court]:

> A parent or agency shall request an impartial due process hearing within 2 years of the date the parent or agency knew or should have known about the alleged action that forms the basis of the complaint, *or if the State has an explicit time limitation for requesting such a hearing under this subchapter, in such time as the State law allows*.

There are two exceptions under 20 U.S.C. § 1415(f)(3)(D):

> The timeline described in subparagraph (C) shall not apply to a parent if the parent was prevented from requesting the hearing due to—
>
> (i) specific misrepresentations by the local educational agency that it had resolved the problem forming the basis of the complaint; or

> (ii) the local education agency's withholding of information from the parent was required under this subchapter to be provided to the parent.

The IDEA limitations period, with its express exceptions, is not subject to equitable tolling. *D.C. and A.C. v. Klein ISD*, ___ F. Supp. 2d ___, No. H-09-1714, 2010 WL 1798943, *7 (S.D. Tex. May 5, 2010)(and cases cited therein).

Nevertheless, the State of Texas has expressly established a shorter limitations period than that in the IDEA. Under Texas law, 19 Tex. Admin. Code § 89.1151, there is an explicit one-year time period for requesting a due process hearing:

> A parent or public agency must request a due process hearing within one year of the date the complainant knew or should have known about the alleged action that serves as the basis for the hearing request.

If the court determines that a school district met procedural requirements and implemented an appropriate IEP reasonably calculated to enable the child to receive educational benefits, the District has no further responsibility. *Rowley*, 458 U.S. at 207; *Michael Z.*, 561 F. Supp. 2d at 598. If not, where a "suitable or 'appropriate' public educational placement is not available for a disabled child within a state or local school district, the district must pay the costs of sending the child to an appropriate private institution." *Michael Z.*, 561 F. Supp. 2d at 598-99, *citing Michael F.*, 118 F.3d at 248, and *School Committee of the Town of Burlington v. Dep't of Educ. of Massachusetts*, 471 U.S.

359, 369 (1985)(concluding that the IDEA authorizes courts to "reimburse parents for their expenditures on private special education for a child if the court ultimately determines that such placement, rather than a proposed IEP, is proper under the Act").

Then IDEA does not expressly provide parents with a private right of action for reimbursement of tuition, but in *Burlington*, the Supreme Court held that the broad grant of authority and discretion to a federal court under the statute to "grant such relief as the court determines is appropriate" includes "the power to order school authorities to reimburse parents for their expenditures on private special education for a child if the court ultimately determines that such placement, rather than a proposed IEP, is proper under the Act."  471 U.S. at 369-70.[10]   It further

_____

[10] The Supreme Court reasoned,

[T]he review process is ponderous.  A final judicial decision on the merits of an IEP will in most instances come a year or more after the school term covered by that IEP has passed.  In the meantime, the parents who disagree with the proposed IEP are faced with a choice: go along with the IEP to the detriment of their child if it turns out to be inappropriate or pay for what they consider to be the appropriate placement.  If they choose the latter course, which conscientious parents who have adequate means and who are reasonably confident of their assessment normally would, it would be an empty victory to have the court tell them several years later that they were right but that these expenditures could not in a proper case be reimbursed by the school officials.  If that were the case, the child's right to a *free* appropriate public education, the parents' right to participate fully in developing a proper IEP, and all of the procedural safeguards would be less than complete. Because Congress undoubtedly did not intend this result,

held that parents who think that their child's IEP fails to meet IDEA requirements may, at their own financial risk, unilaterally remove the child from public school and place the child in private school and then seek retroactive reimbursement of tuition from the state. 471 U.S. at 370.

Moreover, where the public school fails to design an IEP that would provide a FAPE for a disabled student, parents in selecting a private school are exempt from the statutory requirement imposed on public schools to "provide[] at public expense under public supervision and direction" or that the IEP be designated by a representative of the local educational agency and reviewed by that agency because it would effectively eliminate the parents' unilateral right to withdraw their child, established in *Burlington,* and defeat the IDEA's goal of ensuring disabled students would receive a FAPE. *Florence County School District Four v. Carter by and through Carter*, 510 U.S. 7, 13–15 (1993). That the school chosen by the parents is not approved by the state does not by itself preclude reimbursement. *Id.* at 14. As explained in *Carter*, because parents who unilaterally withdraw their child and place him in a private facility bear a risk that a

---

we are confident that by empowering the court to grant "appropriate" relief Congress meant to include retroactive reimbursement to parents as an available remedy in a proper case.

471 U.S. at 370.

hearing officer or court might later decide that the child's IEP was appropriate or the private facility is not appropriate, and because the state education agency and school district is unlikely to cooperate where it disagrees with a private placement, the Supreme Court requires only that the parental placement be "otherwise proper" and not subject to strict IDEA standards for parents to receive reimbursement. *Id.* at 9, 12-15; *Michael Z.*, 580 F.3d at 295-96.

In amendments to the IDEA in 1997, if the local education agency has failed to make a FAPE available to the disabled child and the parents choose to place the child in a private school, reimbursement is available under certain conditions:

> If the parents of a child with a disability, who previously received special education and related services under the authority of a public agency, enroll the child in a private elementary school or secondary school without the consent of or referral by the public agency, a court or a hearing officer may require the agency to reimburse the parents for the cost of that enrollment if the court or hearing officer finds that the agency had not made a free appropriate public education available to the child in a timely manner prior to that enrollment.

20 U.S.C. § 1412(a)(10)(C)(ii).[11]  Despite the provision, "who previously received special education and related services under the authority of a public agency," the United States Supreme Court recently held that when the student is unilaterally placed by the parents in a private institution, even if the student has never received special education services at the public institution such services were entitled to be reimbursed under the IDEA if the

_____

[11] There are limitations, which may reduce or deny reimbursement of the cost of that private school placement

(i) if—

(aa) at the most recent IEP meeting that the parents attended prior to removal of the child from the public school, the parents did not inform the IEP Team that they were rejecting the placement proposed by the public agency to provide a fee appropriate public education to their child, including stating their concerns and their intent to enroll their child in a private school at public expense; or

(bb) 10 business days (including any holidays that occur on a business day) prior to the removal of the child from the public school, the parents did not give written notice to the public agency of the information described in item (aa);

(II) if, prior to the parents' removal of the child from the public school, the public agency informed the parents through the notice requirements described in section 1415(b)(3) of this title, of its intent to evaluate the child (including a statement of the purpose of the evaluation that was appropriate and reasonable), but the parents did not make the child available for such evaluation; or

(III) upon a judicial finding of unreasonableness with respect to actions taken by the parents.

20 U.S.C. § 1412(a)(10)(C)(iii).

public institution did not provide the student with a FAPE. *Forest Grove School Dist. v. T.A.*, ___ U.S.___, 129 S. Ct. 2484 (2009).

In the wake of *Forest Grove*, the Fifth Circuit has adopted its own two-prong test,[12] which is binding on this Court, to determine whether the cost of a unilateral private residential placement is reimbursable under the IDEA:  the placement "must be 1) essential in order for the disabled child to receive a meaningful educational benefit, and 2) primarily oriented toward enabling the child to obtain an education. *Michael Z*, 580 F.3d at 299.  Under the first prong, "if a child is able to receive an educational benefit without the residential placement, even if the placement is helpful

---

[12] Two other tests that have emerged and are discussed in *Michael Z*, have been devised by the Third Circuit in *Kruelle v. New Castle County Sch. Dist.*, 642 F.2d 687 (3d. Cir. 1981)(where residential placement is a response to medical, social or emotional problems that are segregable [*sic*] from the learning process, the parents are responsible for the cost; where full time residential placement is necessary for educational purposes and is part and parcel of the specially designed instruction to meet the unique needs of a handicapped child because his social, medical and emotional problems are so intertwined that it is realistically not possible for the court to separate them, the school district must bear the cost), and the Seventh Circuit in *Dale M. v. Bd. of Educ. of Bradley-Bourbonnais High Sch. Dist. No. 37*, 237 F.3d 813, 817 (7th Cir. 2001)(court must distinguish between services primarily oriented toward enabling a disabled child to obtain an education, which are "related services" reimbursable within the meaning of the IDEA, and services oriented more toward enabling the child to engage in non-educational activities, which are not; in other words, where a student's problems would not interfere with his ability to acquire an education, services for them are not reimbursable).  The *Kruelle* test has been adopted by the Fourth, Sixth, Ninth and D.C. Circuits courts of appeals.  The First, Eighth, and Eleventh Circuits have a similar approach without the express  "inextricably intertwined" standard

-19-

to a child's education, the school is not required to pay for it under IDEA." *Id.* at 300.  The test is in accord with the statute's goal to enable a child with a disability to receive a meaningful educational benefit.  *Id.*  It also meets the implementing regulation, 34 C.F.R. § 300.302, which states that "[i]f placement in a public or private residential program is necessary to provide special education and related services[13] to a child with a disability, the program, including non-medical care and room and board, must be at no cost to the parents of the child."

Under 20 U.S.C. § 1415(i)(3)(A)-(B)(i)(I), "In any action or proceeding brought under this section [§ 1415], the court, in its discretion, may award reasonable attorneys' fees as part of the costs--to a prevailing party who is the parent of a child with a

---

[13] "Related services" is defined in 20 U.S.C. § 1401(26)(A) as

transportation, and such developmental, corrective, and other supportive services (including speech-language, pathology and audiology services, interpreting services, psychological services, physical and occupational therapy, recreation, including therapeutic recreation, social work services, school nurse services designed to enable a child with a disability to receive a free appropriate public education as described in the individualized education program of the child, counseling services, including rehabilitation counseling, orientation and mobility services, and medical services, except that such medical services shall be for diagnostic and evaluation purposes only) as may be required to assist a child with a disability to benefit from special education, and includes the early identification and assessment of disabling conditions in children.

disability."[14]   Thus the threshold question in an action for attorney's fees is whether the party seeking fees is a prevailing party. *El Paso ISD v. Richard R.*, 591 F.3d 417, 421 (5th Cir. 2009)(*citing Jason D.W. ex rel. Douglas W. v. Houston ISD*, 158 F.3d 205, 209 (5th Cir. 1998)), *cert. denied*,___ S. Ct. ___ (U.S. June 21, 2010).  The Fifth Circuit defines a "prevailing party" as one "that attains a remedy that both (1) alters the legal relationship between the school district and the handicapped child and (2) fosters the purposes of the IDEA." *Richard R.*, 591 F.3d at 421-22 (holding that under the IDEA "a litigant must attain some judicial imprimatur on a material alteration of the legal relationship in order to be a prevailing party"), *citing Jason D.W.*, 158 F.3d at 208; *Hensley v. Eckerhart*, 461 U.S. 424, 433 (1983)("[P]laintiffs may be considered 'prevailing parties' . . . if they succeed on any significant issue in litigation which achieves some of the benefit the parties sought in bringing suit."); and *Buckhannon Board & Care Home, Inc. v. West Virginia Department of Health and Human Resources*, 532 U.S. 598, 603-04 (2001)(a prevailing party is one that has obtained a judgment on the merits, a consent decree, or some form of judicially sanctioned relief).  In the administrative proceeding, the Hearing Officer's decision provides the necessary "judicial imprimatur" for a party to be a "prevailing party" for

---

[14] There are exceptions, not applicable here, listed in § 1415(i)(3)(D)(when attorney's fee will not be awarded) and § 1415(i)(3)(F)(when attorney's fee will be reduced).

purposes of a subsequent attorney's fee award by a court.  *Richard R.*, 591 F.3d at 422 n.4.  A prevailing party may seek attorneys' fees under the IDEA for both the administrative due process proceedings and for subsequent litigation in court.  *Id.; Ruben A. v. El Paso ISD*, 657 F. Supp. 2d 778, 789 (W.D. Tex. 2009).  Nevertheless, "'[a] finding that a party is a prevailing party only makes him eligible to receive attorneys' fees under the IDEA; it does not automatically entitle him to recover the full amount that he spent on legal representation.'"  *Richard R.*, 591 F.3d at 421, *quoting Jason D.W.*, 158 F.3d at 209.

If the Court finds that a party is a prevailing party, the fees can be calculated by identifying a lodestar (reasonable fee multiplied by hours expended by the attorney on the case) and then considering if the figure should be adjusted in light of the twelve factors set out in *Johnson v. Georgia Highway Express, Inc.*, 488 F.2d 714 (5th Cir. 1994).  *Ruben A.*, 657 F. Supp. 2d at 789-90.

### Factual Background

Per Hovem, born on November 28, 1989 and now twenty years old, moved from Norway to Texas with his father and mother, Knut Hovem and Signe Hovem, in the summer of 2000, when Per was to enter fifth grade in KISD.  Per was bilingual, speaking Norwegian and English. His parents requested special education services from KISD for Per because of his poor language skills.  After a comprehensive evaluation, Per was diagnosed with mild to moderate Attention

Deficit Disorder ("ADD"), for which Ritalin was prescribed, but he did not qualify as a student with a disability.  Admin. Rec., Vol. I, Petitioners' Ex. 2 at p. 534[15] (Comprehensive Individual Assessment Report).  Thus his ARD Committee recommended an English as a Second Language ("ESL") program for one year, rather than implementing special education services.  *Id.* at 536.

Per transferred to intermediate school at the beginning of the 2001-02 school year.  A highly intelligent boy with an IQ of 142, Per did well in social studies and math, but in language arts he had severe problems with writing and copying from the board.  Admin. Rec., Vol. I, p. 1105.  When Per was in sixth grade, KISD's educational diagnostician Carolyn Bartemeyer found that Per qualified for special education services as Otherwise Health Impaired ("OHI") due to ADD and to a Learning Disability.  *Id.*, Petitioners' Ex. 4 at pp. 586-95.  On October 29, 2001, after determining that Per's writing skills were extremely limited, that his spelling and handwriting skills were very poor, and that he had difficulty in transferring information to paper, his ARD Committee concluded that Per was eligible for special education services, effective December 3, 2001.  *Id.*, Petitioners' Ex. 3 at pp. 567-68. The ARD Committee recommended and provided him with a resource English Language Arts class for two periods each day and co-

---

[15] Bates numbers used by the Court.

teaching support in his social studies and science classes. *Id.* at 587.

On October 30, 2003 KISD Occupational Therapist Dawn McDonald issued an Assistive Technology Assessment Report (Admin. Rec. Vol. I, Petitioners' Ex. 5, at pp. 615-17 (also Respondent's Ex. 13), which counseled modification of Per's special education services to address his spelling errors, illegible handwriting, and difficulty in using a dictionary to correct spelling: it recommended providing Per with study guides and hard copies of notes, access to a class computer for compositions, in particular essay questions, use of a portable speller, and allowing Per to correct spelling errors to improve scores. Reports came back in the following years from a number of Per's teachers that he was not using the portable speller or the computer in class. *See, e.g.,* Admin. Rec., Vol. I, p. 1096; Vol. II, Transcript of Due Process Hearing, pp. 281 and 288-89[16] (testimony of English teacher Lauri Marek); p. 396 (KISD Occupational Therapist McDonald testified that she became aware that he was not using the speller in 10th or 11th grade)[17]. McDonald further stated during the Due Process Hearing (*Id.*, Transcript at

---

[16] Marek testified that at the meeting on May 7, 2008, Per stated that he could use the portable speller but that it took him up to twenty tries before he got the word he needed and using it was very time consuming. *Id.* at 288.

[17] In her OT Re-Evaluation/Discharge Evaluation, Petitioners' Ex. 8 at 164, McDonald lists a number of teachers who reported to her that Per did not use the portable speller in their classes.

394-97) that the portable speller she recommended in 2003 was the same device provided to Per for the next five years, that the choice whether to use it was up to Per, that there was nothing she could do if he chose not to use it, and that although she thought about trying other devices, the one given to him in 2003 was the best one for his disability.

In ninth grade, Per entered Klein Collins High School for the 2004-05 school year.  Following extensive testing, *id.*, Educational Diagnostician Hilda Castagnos found that a significant discrepancy existed between Per's potential and current achievement in the areas of written expression and basic reading skills and that he had a learning disorder in reading and written language, requiring special education and related services.  *Id.*, Petitioners' Ex. 7 at pp. 632-39, KISD's Ex. 9 at p. 117.  In a re-evaluation letter dated October 13, 2005, Dr. Stephanie Wong stated that the diagnosis of ADD no longer fit Per and the OHI label was removed as the basis of his eligibility for special services.  *Id.*, Petitioners' Ex. 7, at p. 641 and 642.  However, Per continued to be eligible for special education services under the Learning Disability category.  Admin. Rec. Vol. 1, KISD's Ex. 9, p. 111.

At the ARD Committee meeting held on September 13, 2006 to plan for the 2006-07 school year, when Per would be in eleventh grade (Petitioners' Ex. 8 at 651-66; KISD's Ex. 4), the ARD Committee decided to mainstream Per completely in general education

classes, and it specified Per's annual goal and objective,[18] which remained the same for each IEP through the 2007-08 school year. The recurring annual goal was that "Per will advance one grade level in all classes with 70% mastery as measured by grades. (With or without use of technology, portable spelling device, OT [Occupational Therapy] supported goal). . . . Continue to use current speller in all classes." Admin. Rec., Vol. 1, KISD Ex. pp. 162-66. The Objective/Benchmark is also described as "Per will advance one grade level in all classes with 70% mastery as measured by grades. (With or without use of technology, portable spelling device, OT supported goal) . . . . Continue to use current speller in all classes." *Id.*[19] Listed modifications included extra time to complete assignments, opportunity to respond orally, copy of class notes, and use of the portable spelling device.

Per passed the written portion of the TAKS test in tenth grade in 2007, but that was the last time; he failed it in three more attempts during the next two years. Per did not pass the written

---

[18] Dawn McDonald explained that an annual goal in an IEP is "where you want the child to get to," the overall goal for a student in a specific area. Objectives or benchmarks under a goal are steps toward the goal. Accommodations are tools to get to the goal and might include assistive technology, copies of notes, extra time, anything that the student might need to achieve the goal in the classroom. Transcript of Due Process Hearing at 469-71.

[19] The Hovems complain that there is no differentiation between what general education students at KISD are expected to do and special education goals supposedly addressing Per's individual needs.

portion of the English Language/Arts TAKS test in the eleventh grade.  Therefore in his senior year he was placed in Greer's Practical Writing class for all students who have failed the written TAKS exam to teach them how to pass the test.[20]  For the rest of his time at KISD, Per passed all of his mainstream general education classes and all TAKS tests except the English Language/Arts.  KISD offered Per tutorial sessions with writing instructor Thomas Greer, but after a few sessions Per stopped coming.

During the 2006-07 school year, the ARD Committee discussed dismissing Per from special education services, but his parents disagreed and asked that the special education services be provided until Per took the exit TAKS test.  In the ARD Committee Meeting held on September 14, 2007 (Petitioners' Ex. 9 at 679; Respondent's Ex. 3 at p. 100) for the 2007-08 school year, Per's senior year,

---

[20] Greer testified during the Due Process Hearing that in Practical Writing he taught the basics of writing, structure and organization, but not spelling, which was Per's area of weakness along with putting his ideas down on paper.  Greer also stated that he tutored Per three or four sessions, but that Per needed help more than once every two weeks, but no one proposed that Greer should spend four days a week with Per.  He further stated that it could take Per up to fifteen minutes to put two to three sentences together, three to four days to write a paragraph, and at least a week and a half to produce a handwritten page, while the average tenth grader could write a sentence in less than a minute. Administrative Rec., Vol. II, Transcript at pp. 90-98.

McDonald recommended dismissal of the Occupational Therapy services, and the Committee agreed.[21]

Per was eighteen years old on November 28, 2007, at which point all rights accorded to his parents under the IDEA were

---

[21] During the Due Process Hearing (Transcript at 400-09), McDonald was questioned about recommending the dismissal of Occupational Therapy for Per during eleventh grade despite the fact that his stated annual goal and objective on his IEPs in eleventh and twelfth grade included continued use of the portable speller provided by OT. Admin. Rec., Vol. I, KISD's Exhibit 12 at p. 1097 ("Occupational Therapy Reevaluation/Discharge Evaluation prepared by McDonald); Petitioners' Ex. 9 at p. 683. McDonald testified that Occupational Therapy services are stopped when a student's IEP goal no longer requires the knowledge of an occupational therapist. Due Process Hearing Transcript at 401. She continued, "In general we do not dismiss children who have not met their goals." *Id.* Yet she agreed that one of Per's IEP goals from 2006-2008 was to use his portable speller and it had not been met when OT services for Per were removed. When asked what a school is supposed to do when a student exhibits behavior that interferes with his learning, such as Per's refusal to use the portable speller, she answered, "I would think--that behavior would be assessed," but she was not aware of any assessment of Per over his refusal to use the only device ever recommended for him. *Id.* at 412. McDonald was asked about Petitioners' Ex. 11 at 761, the IEP for the ARD Committee meeting on 5/21/08 again stated that the "Annual Goal" and the "Benchmarks or Short-Term Objectives" required continued use of the portable speller in all classes. In that same document, next to the list of progress reports dated 2/29/08, 4/18/08, and 6/02/08 on both goal and objective in Per's IEP, under "If not mastered, why not?," are the initials, "MT." McDonald testified that "MT" indicates "more time needed." (The Court observes that Susan Antel testified at the Due Process Hearing that "MT" meant KISD's staff had to wait for report card grades to come out before they could evaluate the student's progress. Transcript at 632.) McDonald also conceded that despite two requests from the Hovems for an evaluation for dysgraphia, the first in 2005, the second in 2006 when the dismissal of OT services was raised, and despite reports to her from a number of teachers that Per was not using the portable speller in their classes, such an evaluation was never done. Transcript at 417-23. (There is a dispute, not resolvable on the record before the Court, as to whether the Hovems withdrew their consent for a dysgraphia evaluation the first time.)

transferred to him.  Tex. Admin. Code § 89.1049(a); 34 C.F.R. §
300.520(a).

That same fall the parents began to explore other options to
KISD, which they concluded was not improving Per's deficiencies, to
help him reach his goal to go to college and live independently.
They learned of the Landmark School, which specializes in
remediating language problems in bright students through use of the
Lindamood-Bell method.[22]  Per interviewed with a Landmark School

_____

[22] According to the testimony of the Hovems' expert, Dr.
Marshall Shumsky, the Lindamood-Bell method is a peer reviewed,
scientifically based method to teach reading to students with
learning disabilities in the last ten years. Admin. Rec., Vol. II,
p. 138.  The Court's own research has found cases confirming that
it and other structured intensive reading programs, such as Orton
Gillingham, are recognized among educators dealing with disabled
students under the IDEA. *See, e.g., Stanley C. v. M.S.D. of
Southwest Allen County Schools*, 628 F. Supp. 2d 902, 907-08 (N.D.
Ind. 2008)("Lindamood-Bell is a research-based developmental and
remedial reading instruction program that focuses on phonemic
awareness, decoding, fluency, vocabulary and comprehension."). *See
also, e.g., D.S. v. Bayonne Bd. of Educ.*, 602 F.3d 553, 561 (3d
Cir. 2010); *J.G. v. Briarcliff Manor Union Free Sch. Dist.*, 682 F.
Supp. 2d 387 (S.D.N.Y. 2010); *Galina C. ex rel. Reed v. Shaker
Regional Sch. Dist.*, No. Civ. 03-34-B, 2004 WL 626833, *1 (D.N.H.
Mar. 30, 2004).  Dr. Shumsky testified that he had dealt with
Landmark School for eighteen years, that it used a method combining
Orton Gillingham and Lindamood-Bell methods, and that it was the
premier school in the United States for students with severe
learning disabilities combined with high IQs.  Admin. Rec.,
Transcript of Due Process Hearing, Vol. II, at pp. 177, 179.  Brett
Hall of Landmark School, who taught Per during the summer of 2008,
described the process of teaching students through the Lindamood-
Bell method and stated that because Per benefitted from the
program, he recommended that Per continue after the summer program
ended.  *Id.* at pp. 314-16, 330.  Marie Mirandi, an experienced
special education teacher at Landmark School, used the Lindamood-
Bell Program with Per starting in September 2008 and described his
progress.  She testified that together they discovered that his
cursive was much more legible and more comfortable for him than

representative, and the family met with the school's Director of Admissions and Diagnostician. Furthermore, because Landmark School does not accept students who have graduated from another high school, in the middle of his twelfth grade year Per chose to drop a required economics class so that he could not graduate.

Moreover, the Hovems learned that Landmark required a student to function at a sixth grade reading and writing level in order to graduate. As part of the application process for admission to Landmark, the Hovems requested and Per participated in a battery of educational tests paid for by the Hovems, for a new evaluation of Per's skills and recommendations for addressing his weaknesses. Admin. Rec., Vol. I, Ex. 9 at pp. 198-201 (Letter from Speech specialist Pamela M. Bass). Bass referred him to Joan Weltzien for a psychological evaluation, with his resulting testing scores on the WAIS-III varying from the 99th percentile (very superior) to the 25th percentile. *Id.* at Petitioners' Ex. 10 at pp. 713-17, with scores on p. 717. KISD's February 19, 2008 Reevaluation Review of Per (*Id.* at 722-33) incorporated the results of the evaluation

---

printing and detailed his strengths, weaknesses, and improvements. *Id.* at 365-78.

Dr. Shumsky further testified that while he knew of two high schools (Briarwood and Monarch) in Houston, Texas, but no other in Texas, that might offer Lindamood-Bell or Orton Gillingham instruction to Per, these two schools were not appropriate for someone with a 142 IQ. Admin. Rec., Transcript of Due Process hearing, Vol. II, at pp. at 214-15.

KISD presented no evidence on alternative school options during the hearing.

performed for the Landmark School.  Moreover the ARD Committee Meeting Brief (*Id.* at 734-35) for its meeting on February 26, 2008 reflects that KISD was informed that Per would attend Landmark School next year if he was accepted.

In addition that spring, the Hovems received from Landmark School its Admission Screening--Test Results from examiner John Hicks, dated March 28, 2008, which provided not only scores and percentiles, but also the equivalent grade levels at which Per was functioning in each area.  According to these results, while Per's comprehension score was high, 142,[23] Per performed at a 5.1 grade equivalent in word identification, 2.0 grade in word attack, 5th grade and four months in reading, second grade fourth month in accuracy of reading, and third grade seventh month in the fluency of reading, while his score for word attack (dealing with phonetic decoding) was in the 1% level.  Admin. Rec., Vol. I, Petitioners' Ex. 11 at p. 737.

In a letter dated April 1, 2008 Per was informed that he was admitted as a boarding student to Landmark's 2008 summer and fall programs.  *Id.* at p. 739.

---

[23] Dr. Rebecca Johnson testified during the Due Process Hearing that Dr. Weltzian gave Per the Wechsler Adult Intelligence Scale test and that he scored 142 on the verbal comprehension index, which places him in the 99th percentile.  Admin. Rec., Vol. II, Due Process Hearing Transcript, p. 267, citing Respondent's Ex. 9; see also Vol. I, Petitioners' Ex. 13, pp. 812, 817.

Landmark School's screening summary for its summer program, dated March 28, 2008, diagnosed Per with "ADD, disorder understanding language--written/spoken & graphomotor/dysgraphia, and [Language Disorder] written lang/reading." *Id.* at 718. The summary contained numerous test scores and an assessment of Per's strengths and weaknesses. *Id.* at pp. 718-21.

On his SATS, Per scored 650 in reading, 640 in math, and 320 on the writing test. Admin. Rec. Vol. I, Petitioners' Ex. 15, p. 431.

At the May 7, 2008 ARD Committee meeting, held at Per's request, Per asserted that he was not ready to leave high school and go to college or to get a job because of his poor spelling and writing skills. The Hovems requested that KISD participate in providing the program at the Landmark School for Per, but other members of the Committee stated that Per had received a FAPE and was ready to graduate. Admin. Rec., Vol. I., Petitioners' Ex. 11, at p. 746. The ARD Committee meeting ended in non-consensus. *Id.*

Meanwhile Mrs. Hovem sent an email to Jean Tucker and Susan Antel, assistant director of special education, pointing out that well intentioned staff members at KISD praise Per's intelligence and ability to do things, but miss the side of him that needs help. She stated that Per hides his writing and reading problems from

people who respect him for his wit and intelligence.  *Id.* at p. 754.[24]

Because the last meeting ended in non-consensus, the ARD Committee meeting reconvened on May 21, 2008.  Admin. Rec., Vol. I., Petitioners' Ex. 11, at p. 757.  Per continued to discuss his difficulties in French and English.  He expressed his frustration that he was not able to use a computer or portable speller on his college applications, claimed that he had only gotten through high school because the tests were multiple choice or short answer, and maintained that he was unable to meet college demands for essays. School officials responded that various colleges and universities offer programs to help disabled students, but they did not offer any other solutions.  After the meeting, the Hovems again informed

---

[24] At the Due Process Hearing, when Per was asked how he passed his classes, he answered, "I guess teachers like me because I was quiet in class.  I always added to the comments.  So, they overlooked me not having a couple of homework assignments or my essays--my test essays weren't always the most legible . . . ." Transcript at 518.

At the same hearing Mrs. Hovem testified that KISD teachers "overly helped" Per to pass his classes.  Because they could not read his handwriting, they would ask him questions and he would give oral responses, so they passed him because he knew the material.  *Id.* at 617-18.  She objects to KISD's contention that passing twelfth grade represents a goal and he is accomplishing it at the same level as his nondisabled classmates because Per has never been asked to perform the same tasks as others in the class. *Id.* at 618.  She also pointed out that SATs and TAKS tests are multiple choice, for which Per, with his reasoning skills, could be fairly successful at guessing the right answer.  *Id.* at 622.  But she argued that in real life, there are no multiple choice tests and being able to perform well on one does not translate into being successful in living a normal life.  *Id.*

the school that they intended to seek placement in a private school for the coming school year and would seek reimbursement because KISD was unable to provide Per with a FAPE.  Admin. Rec., Vol. I. pp. 764-65.

Per then attended the summer program at Landmark School and decided to remain there for the school year.

The Hovems concluded that KISD had failed to provide Per with a FAPE and that Per needed intensive remediation to prepare him for college or to function in a job after graduation.  On June 27, 2008, they filed a request for a special education due process hearing after KISD refused to pay for private placement at Landmark School.  The due process hearing was held December 3-5, 2008. Admin. Rec., Vol. I, p.5.

Lauri Marek, Per's regular-education English teacher during the spring of 2008, testified at the hearing that she only became aware of Per's severe problems in writing when Per came to make up an in-class paper.  Admin. Rec., Vol. II, Transcript at 281-82.[25]

---

[25] Marek explained that she had never reviewed any writing assignment by Per done solely in her class.  Although she required her students do journal writing assignments in class, Per had never turned his in.  *Id.* at 283.  While her students worked on major papers every six weeks in class, for the final product she gave students time at home to polish and type them.  *Id.* at 284. Moreover, for Per's senior memory book project, which was comprised of ten personal narratives about the student's life, he also produced the final product at home on the computer.  *Id.* at 280, 286.  During the same hearing, Per estimated that he did about ten percent of that project in school and the rest at home.  Transcript at 512.

When Marek asked KISD case manager Jean Tucker for help for Per, Tucker recommended the Kurzweil Program,[26] and McDonald arranged for Marek to be trained on it to use with Per.  *Id.* at 284-86.[27]  Marek also shared Kurzweil with Greer, who used it with Per in his writing skills program.  *Id.* at 288.  She reported that Per wrote a two-to-three paragraph essay in about forty minutes, but on the computer with Kurzweil he could only write six sentences at most in the same time.  *Id.* 289.  Marek reported that Per tried Kurzweil in class for his senior memory book project, but became reluctant to use it, and that Per expressed a preference for handwriting.  *Id.* at  286, 291.

Marek also testified that she had called Per's family and voiced her concerns that he get help with typing and working on the computer at home.  *Id.* at 287.  She stated that she may have suggested that his mother or brother might help Per get his ideas typed on paper.  *Id.* at 287, 300-01.  She further testified that at the May 7, 2008 ARD Committee meeting, Per stated that he could use

---

[26] Marek explained that Kurzweil, a word-recognition software for the computer, does on a desktop what the portable speller does: you punch in a few letters and it produces a menu of words to choose from.  Admin. Rec., Vol. II, Due Process Hearing Transcript at 291.

[27] During her testimony at the Due Process Hearing, Mrs. Hovem pointed out that Pamela Bass's evaluation of Per in December 2007 had recommended use of Kurzweil and that by February 2008 the ARD Committee and KISD had that report, but they did not implement use of Kurzweil until Marek on her own initiative asked what could be done to help Per.  Transcript at 570-71.

his portable speller, but that it took him up to twenty tries before he could find the word he needed and thus using it was very time consuming.  *Id.* at 288.  Marek indicated that Per did not use the portable speller in her class.  *Id.*  When Marek asked Per where his speller was, he responded that he did not need it or felt more comfortable without it.  *Id.* at 289.

Per testified extensively during the Due Process Hearing (Transcript at 474-542).  Asked to identify his learning problems, he named spelling, "true reading" (and not just guessing), inability independently to come up with ideas of his own and being able to write them down, mispronouncing words when he reads aloud, leaving out words or injecting words into his reading, inability to pronounce a word that he recognizes, inability to identify a word just by looking at it, having to use context clues to figure out what a word means, and proofreading his own work.  *Id.* at 475-77. Relying heavily on his mother, father, and brother to fill in his gaps, he stated that without his mother, he would have failed English long ago, and he was most concerned that he could not bring his parents with him when he goes to college or to a job.  *Id.* at 484, 489.  He explained for a long time he thought that to be prepared for college, all he had to do was graduate from high school.  *Id.* at 489.  When in the summer and fall of 2007 he saw the college applications, he realized that he could not fill them out without heavy reliance on his family and that he had to do

something to prepare himself for college. *Id.* at 489, 513. When he asked at the May 2008 ARD Committee meeting why his deficiencies were not addressed earlier, he said the Committee was surprised--"why would they be surprised if they truly understood [my] writing and reading capabilities?" *Id.* at 491. He stated that he never got an answer. *Id.* at 492. He told the Committee how time consuming trying to write was for him, about his reliance on others, and that he was not ready to do college level work or even to graduate from high school. *Id.* at 492, 495. He further stated that the school never gave him any kind of written proposal on goals and objectives to help him pass the TAKS ELA. *Id.* at 494. He had a presentation ready for the ARD meeting, but when he asked why his IEP never addressed the need to remediate his weaknesses, the Committee members responded that he had been doing fine and was ready to graduate, so why change. *Id.* at 495, 497. Per noted that every time he was behind on an assignment, daily or major, his teachers asked him to finish it at home, and he would have his parents or brother type it for him: "that's one of the main--main reasons why I even passed through--got through high school at all." *Id.* at 500-01. He also stated that he had never met with any KISD counselors about post school transition planning. *Id.* at 504-05. Per explained that it took him five hours spread over a week to fill in his one-page application for Landmark School because it took a lot of time to come up with what to say and then he had to

struggle with spelling and re-reading (Respondent's Ex. 9). *Id.* at 505-06.   He testified that he realized "if this is just the application, imagine the course work," and that his reliance on his parents was the main reason he sought outside assistance and discovered Landmark School.   *Id.* at 512.   Regarding Marek's senior writing project, Per explained that he tried to do it in class, but failed, so he began taking it home and having his mother type it out, so his progress grades improved.   *Id.* at 511.   He estimated that he did about ten per cent of the writing in school and ninety per cent at home.   *Id.* at 512.

On June 26, 2008 the Hovems filed an original complaint and a request for a due process hearing.   At the Due Process Hearing, held from December 3-5, 2008, Mrs. Hovem testified that the Hovems participated in many ADR meetings, with many people telling them that Per was wonderful, bright, handsome, and respectful, and achieved good grades and TAKS test scores.   They received reassurances that Per was on track for graduation, as well as praise for their involvement.   Only after outside testing during his senior year provided grade equivalents to his scores, did they realize Per's actual status.   Transcript at 556-57.   Nor, Mrs. Hovem testified, did she know until the spring of 2008 what the IDEA required in an IEP and how deficient Per's IEPs were.   *Id.* at 605-06, 624.

### Hearing Officer's Decision

On January 9, 2009, the Hearing Officer issued his opinion (Admin. Rec., Vol. I at pp. 5-27), in which he determined that KISD had failed to provide a FAPE to Per, that Landmark School did provide an appropriate educational program for his needs, and that the costs of Per's placement at Landmark School for the school years of 2008-09 and 2009-10 should be reimbursed to the Hovems.

In addition to some of the undisputed facts this Court has summarized above, among the Hearing Officer's findings of fact are the following.  KISD has known about Per's writing problems since at least 2002.  *Id.* at p. 7.  Per's "IEP goals and objectives [to pass his classes and use his speller] have been virtually identical since at least 2006."  *Id.* at p. 8.  It is undisputed that Per "is highly intelligent and has passed all of his classes while at Klein Collins High School and at Landmark School."  *Id.*  The district was aware that Per was not using his portable speller.  *Id.*  In the fall of 2007, Per deliberately dropped his economics class so that he could not graduate in May 2008 in order to be eligible to attend the Landmark School, which does not admit any student who has already graduated from high school.  *Id.*  Landmark specializes in teaching highly intelligent children with language disabilities. *Id.*  Landmark's peer-reviewed, scientifically based teaching method, Lindamood-Bell, uses a multi-sensory approach to problems with auditory processing of language, such as those which afflict

-39-

Per.  *Id.* at 8-9.  While Per was in high school in KISD, he "did the vast majority of his writing work at home" by using the services of his mother or brother.  *Id.* at 9.  In eleventh and twelfth grade, Per failed the writing portion of the TAKS test, passage of which was required for graduation.  *Id.* at 9.  According to his writing teacher, Per required several hours to write a few sentences and several days to write a few paragraphs.  *Id.*  Per has lived at Landmark School, in Massachusetts, since he enrolled in the summer of 2008 and is part of the school's residency program. Per's ARD Committee, when notified of the placement, disagreed with it even though no evidence was presented that anyone from KISD investigated Landmark and its appropriateness for Per.  *Id.*  The only evidence on that matter was the testimony of Dr. Mary Rosenburg, KISD's representative, that she did not know if any investigation was conducted.  *Id.* at 10.  Landmark employs a daily one-on-one tutorial session using the Lindamood-Bell method for a student with a disability.  *Id.*  Its classes are structured to use language skills during the course materials.  *Id.*  The Landmark School educational program "is appropriate to address the Learning Disability of the child in this case."  *Id.*

The Hearing Officer rejected a number of Per's allegations of violations of the procedural requirements of IDEA04 that denied him

a FAPE.[28]   He concluded that there was no evidence that KISD failed
to provide Per with highly qualified teachers or that it did not
hire, train or supervise staff capable of meeting Per's unique
needs.   *Id.* at 11.   There was also no credible evidence that Per
needed non-academic services, such as counseling and social work
services.   *Id.*   All Per's teachers who were asked testified that he
interacted well with other students, participated in class
discussions, and was socially functional.   *Id.* at 11-12.   During
the three-day Due Process Hearing, Per's demeanor was pleasant, and
he appeared to have no social issues.   *Id.* at 12.   The Hearing
Officer also found that there was "no evidence that any of the ARD
Committee members had collaborated prior to the ARD Committee
meetings to predetermine the child's educational plan."   *Id.*   In
addition he determined that the district had provided the Hovems
with timely and objectively verifiable and understandable reports
on Per's IEP goals through report cards and progress reports sent
home throughout the year.   *Id.*

---

[28] In early 2004 Congress reauthorized and renamed the Act as
the Individuals with Disabilities Education Improvement Act of 2004
("IDEA04"), which retains the major provisions of earlier version
but aligns the IDEA more closely with the No Child Left Behind Act
of 2001, 20 U.S.C. §§ 6301, *et seq.   See generally* Philip T.K.
Daniel, *"Some Benefit" or "Maximum Benefit": Does the No Child
Left Behind Act Render Greater Educational Entitlement to Students
With Disabilities*, 37 J.L. & Educ. *347 (July 2008); Dixie Snow
Huefner,* The Final Regulations for the Individuals With
Disabilities Education Improvement Act (IDEA '04), 217 Ed. Law Rep.
1 (May 3, 2007).

Nevertheless the Hearing Officer concluded that the district failed to create a transition plan[29] for Per commensurate with his needs.  IDEA04 requires an IEP to include, beginning when he is 16 and updated annually afterward, "(1) appropriate measurable postsecondary goals based upon age appropriate transition

---

[29] An Individual Transition Plan ("ITP") is required to be included as part of a child's IEP once he is sixteen years old.  20 U.S.C. § 1414(d)(1)(A)(VIII)("beginning not later than the first IEP to be in effect when the child is 16, and updated annually thereafter . . . appropriate measurable post secondary goals based upon age appropriate transition assessments related to training, education, employment, and, where appropriate, independent skills" and identifying "transition services (including courses of study) needed to assess the child in reaching these goals.").  The IDEA defines "transition services," 20 U.S.C. § 1401(34), and codified at 34 C.F.R. § 300.43, as

> a coordinated set of activities for a child with a disability that--
>
> (A) is designed to be within a results-oriented process, that is focused on improving the academic and functional achievement of the child with a disability to facilitate the child's movement from school to post-school activities, including post-secondary education, vocational education, integrated employment (including supported employment), continuing and adult education, adult services, independent living, or community participation;
>
> (B) is based on the individual child's needs, taking into account the child's strengths, preferences, and interests; and
>
> (C) includes instruction, related services, community experiences, the development of employment and other post-school adult living objectives, and, when appropriate, acquisition of daily living skills and functional vocational evaluation.

assessments related to training, education, employment, and where appropriate, independent living skills, (2) the transition services (including courses of study) needed to assist the child in reaching those goals, and (3) beginning not later than one year before the child reaches the age of majority under state law, a statement that the child has been informed of the child's rights under this title, if any, that will transfer to the child on reaching the age of majority. 20 U.S.C. §1414(d)(1)(A)(VIII). *Id.* at 12-13. He found it undisputed that Per's IEP did not contain postsecondary goals based upon transition assessments testified to by Dr. Rosenburg, even though a transition plan must be based upon the child's needs in view of his strengths, preferences, and interests, pursuant to 34 C.F.R. § 300.43(a)(2). *Id.* at 13. It must also contain measurable goals that are results-oriented. The Transition Services Supplement and Individual Transition Plan that were made part of Per's IEP contained only general information that did not meet these requirements. *Id.* at 13. It also failed to specify coordinated activities or goals for improving his academic and functional achievement to facilitate Per's move from high school to postsecondary activities. *Id.*

Finally the Hearing Officer focused on Per's learning disability in the area of written expression, which causes him problems with spelling, phonetics, legible handwriting, omitting entire words when writing, and the difficulty in transferring ideas

from his mind to paper. *Id.* at 14.  He noted that Per's writing
teacher, Thomas Greer, testified it could take Per two to four days
to write one paragraph and a week and a half to write one
handwritten page. *Id.*  Mrs. Hovem testified that Per cannot take
down a simple telephone message. *Id.* at 15.  Laurie Marek also
testified about Per's severe writing problems, which concerned her
so much that she called his parents, and that he did almost all of
his writing at home, where he received help from his family.  He
noted that there is no dispute that Per is highly intelligent,
reads well, and has no trouble comprehending what he reads. *Id.*
The Hearing Officer then stated,

> If this child were NOT a special education child with the
> rights and protections outlined in IDEA04, then this
> child would be required to pass all his classes and pass
> all portions of the state assessment exam (the TAKS) in
> order to graduate.  In short, the child would have to
> pass his class like all other children by making a 70% or
> better grade in his classes, and he would also have to
> take the TAKS exam without any accommodations and achieve
> a passing mark in all areas.  However, this child IS a
> special education child afforded the protections of
> IDEA04.  Even so, the child's IEP since 2006 has had the
> same goals and objectives:  (1) pass all his classes with
> 70% mastery, and (2) use his speller. . . . The first
> goal listed in the IEP has nothing to do with the child's
> Learning Disability.  It is a goal that is the same for
> all non-special education students who desire to
> graduate.  The second goal is designed to help the child
> with his spelling problem, and this goal was not being
> met since all of the child's teachers had reported in an
> Occupational Therapy Re-Evaluation as early as 2006 that
> the child did not use the speller. . . . Furthermore,
> such a goal is not measurable, in violation of IDEA04,
> and it does not address core problems associated with
> this child's Learning Disability.  Thus this child went
> through the last two years of school at Klein ISD with
> essentially no goals and objectives different from a non-

> special education child.  That being said, the child
> still made passing grades in his classes, but that was in
> spite of his IEP and not because of it.  The district
> failed to develop and implement an IEP which was created
> to address the unique and individual needs of the child
> in order to provide the child with an educational
> benefit. [citations to record omitted]

*Id.* at 15-16.

In summary, the Hearing Officer concluded that these failures
to implement a transition plan and to develop an IEP tailored to
Per's unique needs amount to procedural violations of IDEA04.[30]  *Id.*
at 16.  Therefore he examined whether the failure impeded the
child's right to a FAPE, significantly impeded the parents'
opportunity to participate in the decision making process regarding
the provision of FAPE for Per, or caused a deprivation of
educational benefits to the child.  20 U.S.C. § 1415(f)(3)(E)(ii).
*Id.*  Because of the procedural violations, he addressed the
question whether Per's IEP was reasonably calculated to enable Per
to receive educational benefits.  *Id.* at 16-17.

The Hearing Officer observed, as reflected in the exhibits,
Per's handwriting is barely legible and that KISD suspected he
suffered from dysgraphia as far back as February 6, 2002, when the
KISD Re-evaluation Report (Petitioner's Ex. 4) stated that Per
"exhibits symptoms consistent with a diagnosis of dysgraphia or a

_____

[30] The Hearing Officer appears to have conflated procedural and
substantive violations, but it is obvious he is discussing
substantive deficiencies here.  Moreover since a finding of either
can indicate a failure to provide a FAPE, this failure to
distinguish is not fatal.

significant writing disorder." *Id.* at 17. This Court has summarized testimony from Marek *supra* that shows that "[i]nstead of dealing with the problem and its causes, the district encouraged the child to do his writing at home hoping the family would help the child." *Id., citing* Hearing Transcript at 286-87. He also found that KISD knew Per wanted to go to college after high school, a goal which the Hearing Officer determined would be extremely difficult without adequate writing skills and an ability to take notes and answer essay exams. *Id., citing* Respondent's Ex. #4 at 28, Hearing Transcript at 530-31. He also concluded that there were no goals developed or implemented for Per to attain that ambition in a transition plan, nor in Per's IEP to assist him with his numerous language problems to help him go to college. *Id.*

In sum, the Hearing Officer concluded that Per did not receive an educational benefit from his IEP, including its lack of a proper transition plan, because it failed to address Per's unique disabilities. *Id.* Per did pass and receive an educational benefit from his general education classes because of his high intelligence and family support, not because of his IEPs. Per failed the writing portion of the TAKS test three times, and under his IEP he could not have graduated high school without passing it. *Id.* By 2002 the ARD Committee should have modified Per's IEP to provide services, goals and objectives to meet his needs, though no relief can be granted to remedy this failure that far back because of the

two-year statute of limitations. *Id.* at 19.  In January 2004 the ARD Committee recognized the need for "a significant modification in curriculum and methods." *Id.;* Petitioner's Ex. 6 at 122.  In 2005, Per's teachers reported that he was not making adequate progress in writing (Petitioner's Ex. 7 at 131).  In 2006 his teachers continued to report that Per was not using his speller, which was his second IEP goal.  Petitioner's Ex. 8 at 164; Hearing Transcript at 59, 395-98.  The ARD Committee should have met to attempt to find another solution to Per's spelling problems.  As noted in the December 6, 2006 Occupational Therapy Re-Evaluation, some of his teachers pointed out that his handwriting was not legible.  Petitioner's Ex. 8.  Again the IEP should have been modified to address the continuing problem.  Then in Spring 2007, Per failed the writing portion of the TAKS exam, and did so twice more, yet throughout this period the ARD Committee did not modify his curriculum, the teaching methods, or his goals or objectives. At the February 26, 2008 ARD Committee Re-evaluation, KISD stated that Per "is doing very well in school."  Petitioner's Ex. #10 at 229.  While passing from grade to grade is an important factor in determining if a child's IEP is providing him with a FAPE, the IEP must be examined in light of his individual disabilities.  Here Per continued with essentially the same IEP, which did not address Per's unique Learning Disability, from the Fall of 2006 through May 2008.  Thus Per did not receive an educational benefit that was

meaningful and likely to produce progress.  Cf. the continuing and substantial efforts and modifications made by the ARD Committees to address a student's disabilities in *Michael F.*, 118 F.3d 245; *Bobby R.*, 200 F.3d 341; *Adam J. ex rel. Robert J. v. Keller ISD*, 328 F.3d 804 (5th Cir. 2003).

Having determined that Per succeeded in overcoming the presumption that the IEP developed by KISD was appropriate, the Hearing Officer examined whether placement at Landmark School, a private institution, is appropriate for Per.  Dr. Rosenburg, KISD's representative, admitted that she was unaware of any investigation of Landmark School made by KISD after it was notified by Per that he wanted to enroll; thus KISD offered virtually no evidence on the issue.  Per presented evidence in the testimony of his expert, Dr. Shumsky.  The Hearing officer questioned the credibility of portions of Shumsky's testimony because of speculation, conclusory statements, exaggeration, and a lack of knowledge about the latest regulations concerning the identification of Learning Disabilities under IDEA04; nevertheless the Hearing Officer did find Shumsky's testimony about the Lindamood-Bell methodology of teaching believable.  Hearing Officer's Decision at 23.  Also testifying about the appropriateness of the Landmark School program for Per were its case manager Brett Hall (Hearing transcript at 314-16) and special-education-certified teacher and Per's one-on-one tutor at Landmark, Marie Mirandi (Hearing transcript at 367-69, 311-12, 347-

-48-

48, 333, 342-44, 339-40.[31]  Per's 2008 summer session consisted of
two forty-five minute one-on-one tutorials on a daily basis and
small classes.  The Hearing Officer determined from the testimony
of Hall and Mirandi and from Landmark documentation that Per made
good progress and continues to do well.  Hearing Officer's Decision
at 24, *citing* Hearing Transcript at 328-30, 367-68, 370, and
Petitioner's Ex. #12 at 26-68, 351.  As part of Landmark's
residential program, Per lives on campus in the dormitories,
participates in a daily evening study hall (with staff available to
assist the student in any way), a once-a-month, mandatory Saturday
school program, structured activities in the afternoons, and
community service.  *Id.*, citing Due Process Hearing Transcript at
260-68, 351-53.  The Hearing Officer decided that evidence about
Per's social skills did not indicate a need for social skills
training.  *Id.*  The Hearing Officer also stated that because
Landmark is in Massachusetts, Per had to reside there to attend the
school.  *Id.* at 25.  He further found no evidence that the

---

[31] Mirandi's testimony indicated that the school is structured
so that each student receives one-on-one tutoring to work
particularly on that student's individual disabilities and
weaknesses.  Classes are structured to develop the student's
language skills by multi-sensory methods.  The program is highly
individualized to ensure that each child will work on his area of
weakness and need throughout the school year.  Per was admitted to
a two-year program based on his initial assessment at the school,
and Brett Hall testified that after completing the program. Per
should be ready to attend college.

residential program was excessive.  In sum, he found the program and placement at Landmark School were appropriate for Per.  *Id.*

As testified to by Dr. Shumsky, in the only evidence on the issue, only two Houston area schools offered the Lindamood-Bell methodology and placement at either was inappropriate for a child with a high IQ.  *Id.*, *citing* Hearing Transcript at 214-15.

In sum, the Hearing Officer granted the relief requested by Per, ordered reimbursement for tuition, books, fees and the residential component of Per's placement at Landmark School from June 2008 through the time the child completes the program,[32] although KISD will not be liable for any costs for the program beyond May 2010.[33]  *Id.* at 27.

### KISD's Motion for Summary Judgment (#17)

KISD's motion for summary judgment challenges the "correctness of the hearing officer's decision at the time it was issued," which KISD characterizes as "a radical departure from the legal standards adopted by the Fifth Circuit in cases arising under the IDEA."  #17 at 1-2.

KISD represents that the Hearing Officer found that KISD denied Per Hovem a FAPE because KISD failed to develop Per's

---

[32] Based on the testimony, the Hearing Officer determined that up to that date, the reimbursement amount was $66,630.00

[33] Should Per meet the criteria for graduation by the summer of 2009, with no further need for enrollment in Landmark, KISD would not be obligated to reimburse the costs for the 2009-10 school year.

writing skills to a level that would guarantee him success in college. KISD points out that Per's severe qualifying learning disability is in the area of written expression and causes him to have problems transferring his thoughts and ideas to the printed page. Admin. Rec., Vol. 1, at p. 7, ¶ 1. KISD insists that the IDEA does not require a school district to provide an optimal education designed to remediate Per's disability, nor does it require KISD to provide an education designed to make sure that a student excels in college.[34] The school district emphasizes that Per passed the state-mandated assessments of adequate educational achievement for non-disabled students and passed all of his regular

---

[34] KISD cites and quotes another hearing officer's decision in *Fort Bend Indep. Sch. Dist.*, TEA Dkt. No. 036-SE-1000 (Tex. Dec. 20, 2000), copy attached as Ex. A to #17:

> Special education does not guarantee that a student will be able to be admitted or succeed in college. This is simply beyond the goals of Congress in enacting IDEA. . . . College preparation is clearly beyond the "educational floor" of which the Court spoke in *[Bd. of Educ. of Hendrick Hudson Central Sch. Dist. v. Rowley*, 458 U.S. 176 (1982)]*.

The Hovems challenge the applicability of *Fort Bend* here because (1) the ARD Committee's IEP for Per speaks expressly of "college preparation" as a goal; (2) because the committee failed to address Per's continual failure on the TAKS writing test, which was not an impediment in the *Fort Bend* case; and (3) because the legal analysis did not address any of the transition service planning issues emanating from changes in the IDEA in 1997 and 2004, which the Hovems brief in their response, discussed in this opinion and order. #39 at 27 n.14.

education classes[35] with minimal special education support.  In the spring of 2008, as an 18-year-old student at Klein Forest High School, Per was on track to receive a high school diploma until he dropped a required economics course during his senior year so that he could participate in a private school program designed to remediate his disability.  KISD describes Per as a highly intelligent person, who received significant educational benefits in regular education classes in KISD, as the Hearing Officer acknowledged.[36]  KISD seeks reversal and vacating of the Hearing

---

[35] Specifically KISD highlights the fact that Per passed three (Mathematics, Social Studies, and Science, with commended performance on the last two) of the four Exit Level Texas Assessments of Knowledge and skills ("TAKS") tests.  TAKS is the State's measure of adequate educational progress for students without disabilities.  Per had passed the 10th grade English/Language Arts ("ELA") TAKS test, and argues that he missed passing the Exit Level ELA TAKS test by one point due to his low score on the written composition portion.  Admin. Rec. (#9), Vol. I, at pp. 1116, 1118.

[36] In *Rowley*, 458 U.S. at 202-03, the Supreme Court considered how to determine when handicapped children are receiving sufficient education benefits to satisfy the requirements of the IDEA and indicated one factor:

> When the "mainstreaming" preference of the Act has been met and a child is being educated in the regular classrooms of a public school system, the system itself monitors the educational progress of the child.  Regular examinations are administered, grades are awarded, and yearly advancement to higher grade levels is permitted for those children who attain an adequate knowledge of the course material.  The grading and advancement system thus constitutes an important factor in determining educational benefit.  Children who graduate from our public school systems are considered by our society to have been "educated" at least to the grade level they have completed, and access to an "education" for

Officer's decision in all things against KISD, and affirmance of his decision in all aspects in KISD's favor.[37]  KISD also asks the Court to enter a judgment that KISD provided Per with a FAPE at all times and is not liable to the Hovems for reimbursement of private educational expenses or any others costs.

KISD identifies four issues for its appeal:  Did the Hearing Officer wrongly conclude that (1) Per was denied a FAPE because KISD failed to remediate his disability to the extent that college would not be difficult for him; (2) the procedural violations of the IDEA allegedly committed by KISD denied Per a FAPE; (3) Per, an adult student, was entitled to reimbursement of private school expenses incurred by his parents; and (4) the one-year statute of

---

handicapped children is precisely what Congress sought to provide in the Act.

Nevertheless, the Supreme Court expressly refused to hold that "every handicapped child who is advancing from grade to grade in a regular public school system is automatically receiving a 'free appropriate public education.'"  *Id.* at 203 n.25.

[37] As noted, the Hearing Officer found that Defendants failed to present any evidence that KISD instructors were not highly qualified; that KISD hired, trained or supervised staff incapable of serving Per's unique needs; that Per needed any non-academic services such as counseling or social work; that the ARD Committee did not work collaboratively with the Hovems at every meeting to determine an appropriate educational plan; and that the Hovems did not receive timely and objectively verifiable notice regarding progress toward Per's IEP goals because the regular education report cards and progress reports provided "constant gauging of the progress the child was making towards his IEP goal."

limitations applicable to due process hearing requests in Texas did
not apply to adult students?[38]

According to KISD, Per's parents agreed with the educational
decisions made by KISD over eight years,[39] but in Per's senior year
they decided that his writing skills needed intensive remediation
in an exclusive private school for intelligent children with
learning disabilities, the Landmark School in Massachusetts.
Admin. Rec., Vol. 1, p. 926.  Per's parents also contend that Per's
deficient written expression and his unreadiness to be successful
in a college of his choice were attributable to KISD's failure to
educate him properly.  Admin. Rec., Vol. II, at p. 588, ll. 5-10
and p. 564, ll. 17-24.  The parents filed a request for a special
education due process hearing after KISD refused to pay for private
placement of Per at Landmark School, insisting that KISD had
provided a FAPE to Per.  Only if the school district is unable to
provide a student with an "appropriate" education within the school

---

[38] As noted, Per, who turned eighteen in November 2007, was an
adult at the time the Hovems filed for the Due Process Hearing.
For that hearing Per was adjudicated the sole petitioner, although
he executed a power of attorney in favor of his parents, allowing
them to remain in the courtroom as his agents.  Hearing Officer's
Decision at p. 5.

[39] With citations to the administrative KISD details its year-
by-year history of providing Pers with special educational
services, with oversight of an Admission, Review and Dismissal
("ARD") Committee, to meet his special needs since his arrival from
Norway in 2000, when he was placed in fifth grade.  #17 at 5-19.

district, must the school district pay to send the child to a private school that can. *Michael F.*, 118 F.3d at 248.

According to KISD, the Hearing Officer erroneously concluded that KISD deprived Per of a FAPE because it failed to address his writing deficiency in his IEPs. Admin. Rec., Vol. 1, p. 16. The Hearing Officer further decided that because the District aimed for Per to master the same goals and objectives as non-disabled students, Per's success was "in spite of his IEP, not because of it." *Id.* at p. 16. The Hearing Officer also erred in concluding that the Transition Plan, developed and reviewed each year since Per was fourteen, was flawed because it did not equip Per for success in college by preparing him to take class notes or pass essay exams. *Id.* at pp. 17-18. The Hearing Officer, while noting the obvious educational benefit Per received in KISD, gave the credit for that benefit not to the teachers or to the efforts of the ARD Committee over the years, but to Per's "high intelligence and family support." *Id.* at p. 18.

KISD argues that the Hearing Officer wrongly determined that KISD denied Per a FAPE based on the Hearing Officer's conclusion that KISD committed "procedural" violations of the statute by (1) failing to develop an appropriate IEP designed to give meaningful educational benefit to Per and (2) failing to develop an appropriate transition plan with specific goals designed to ensure success in College. Admin. Rec., Vol. I, at pp. 12-14. KISD

maintains that the Hearing Officer's analysis erroneously conflates the two-part test in *Rowley*.[40]   Although he asserts a procedural violation, his ultimate conclusion rests on his substantive finding that Per was "deprived of a benefit from his IEP."   *Id.* at p. 22. Nor did the Hearing Officer apply the four factors established in *Michael F.*[41] to the evidence to determine if the IEP was reasonably calculated to enable the child to receive an educational benefit.

Regardless, argues KISD, the Hearing Officer's conclusions are erroneous in two respects.  First, the Hearing Officer thought that KISD had a duty to do more than address Per's writing problems because "to attend college without adequate writing skills would be extremely difficult."  Admin. Rec., Vol. I, at p. 13.  In *Rowley*, 458 U.S. at 192, the Supreme Court opined that "the intent of the Act was more to open the door of public education to handicapped children on appropriate terms than to guarantee any particular level of education once inside."   Congress required a school

---

[40] As noted previously, in determining whether an IEP is appropriate, the district court should follow a two-step review, the first procedural, the second substantive: (1) it must determine whether the state complied with the IDEA's procedural requirements, and (2) decide whether the IEP was "reasonably calculated to enable the child to receive educational benefits." *Rowley*, 458 U.S. at 206-07.

[41] Whether (1) the program is individualized on the basis of the student's assessment and performance; (2) the program is administered in the least restrictive environment; (3) the services are provided in a coordinated and collaborative manner by the key "stakeholders"; and (4) positive academic and non-academic benefits are demonstrated.  *Michael F.*, 118 F.3d at 253.

district only to provide a "basic floor of opportunity." *Id.* at 200. If the school district provides the disabled student with a meaningful educational benefit, it does not violate the IDEA even if the student's potential to be successful is not maximized. *Michael F.*, 931 F. Supp. at 481 n.5. The Hearing Officer also ignored the fact that federal law permits students with disabilities to receive instructional accommodations in public colleges. Admin. Rec. Vol. I at p. 880; *Zukle v. Regents of the Univ. of Calif.*, 166 F.3d 1041, 1046-47 (9th Cir. 1999)(Section 504 and the ADA require universities to make reasonable accommodations for students with disabilities). Second, in concluding that Per was deprived of an educational benefit from his IEP, the Hearing Officer erroneously focused on Per's area of weakness, his disability in written expression; measuring the appropriateness of an IEP based only on the student's area of weakness to the exclusion of his strengths is contrary to Fifth Circuit law. *Bobby R.*, 200 F.3d at 349-50 (student need not show progress in every area to obtain an educational benefit, as long as he receives an overall educational benefit from implementation of his IEP). None of Per's doctors or teachers or KISD's staff can cure his disability. Admin. Rec., Vol. II at p. 273, ll. 11-14 (testimony of Per's expert, Dr. Rebecca Johnson). KISD emphasizes that there is no disagreement that Per achieved a high level of academic

success compared to his non-disabled schoolmates except in the area of writing.

KISD argues that the appropriateness of Per's IEP goals and objectives is a substantive issue, not a procedural issue, and it involves the determination of whether the IEP as a whole was reasonably calculated to provide Per with an educational benefit. An analysis using the Fifth Circuit's four factors under *Michael F.* is appropriate for such a substantive issue. Moreover, KISD contends that it did not commit procedural violations of the IDEA by failing to develop an appropriate IEP and/or failing to develop an appropriate transition plan. Furthermore it notes that a school district's failure to satisfy the statutory procedural requirements will not constitute a violation of its obligation to make a FAPE available to the student unless the inadequacy (1) obstructed the student's right to a FAPE, (2) significantly impeded the parent's opportunity to participate in the decision making process regarding the provision of a FAPE to the student, or (3) caused the deprivation of educational benefit. 20 U.S.C. § 1415(f)(3)(E)(ii); *see also Adam J. ex rel. Robert J. v. Keller ISD*, 328 F.3d 804, 811-12 (5th Cir. 2003)(procedural defects by themselves do not constitute a violation of the right to a FAPE unless they result in the loss of an educational opportunity).

A child's IEP must contain appropriate transitioning services. The Hearing Officer found that the transition plan

developed by KISD was procedurally inadequate because it contained only general information, insufficient to meet IDEA04 mandates. Admin. Rec., Vol. I at p. 13.   KISD points out that the Hearing Officer erred in citing the testimony of Dr. Mary Rosenburg, its Executive Director of Student Support Services, for the proposition that "it is without dispute that the child's IEP contained no post-secondary goals which were based upon transition assessments." Admin. Rec., Vol. II at p. 31, ll. 19-20.   In actuality Dr. Rosenburg merely stated that the student had no specific transition goals "other than within his ITP." *Id.*, Vol II at p. 487. As long as the transition goals were in the IEP somewhere, it does not matter where.   20 U.S.C. §  1414(d)(1)(A)(ii)(II)(IDEA does not require the ARD Committee to include information under one component of a child's IEP that is already contained under another).

Because KISD understood that Per's post-secondary goal was to attend college, the ARD Committee's transition plan for Per, beginning in his freshman year in high school, was that he would graduate "Outcome 1" under the State's Recommended High School Program and pass the TAKS test.   Admin. Rec. Vol. I, at pp. 974, 1071.  The ARD Committee identified the needed transition services and access to the same general education curriculum ("course of study") as his non-disabled peers.   It also considered Per's expectation that he would participate in competitive employment

post-secondary and concluded that the only supports he needed for that goal were natural supports through family and friends.  As for Per's goal to live independently right out of high school, the Committee  decided that he did not need any support from school to achieve that goal or his goal to access and participate independently in recreational and leisure activities.

Regarding instructional transition services needed to prepare Per to reach his post-secondary goals, the Committee provided access to general education curriculum and career technology education courses up to his graduation.  Admin. Rec., Vol. I, at p. 1045.  The ARD Committee and Per's parents thought he could be successful in the same curriculum, including writing courses, as his non-disabled peers.  KISD maintains nothing more is needed for a student to be able to attend college.  As noted, Per successfully passed all courses required for the Recommended High School Program, all portions of the TAKS test his sophomore year, and all but one portion of the EXIT level TAKS test his Junior year.  Adm. Rec., Vol. I, at pp. 1115-18.  He did not have to achieve 100% of the goals that the ARD Committee set for him to establish the sufficiency of the IEP.  Since 95% of Klein Oak High School's graduating class goes to college, it was not unreasonable for the ARD Committee to believe that a diploma earned under Texas' Recommended High School Graduation Plan would allow Per to reach his college goal.

KISD charges that the Hearing Officer wrongly incorporated a nonexistent substantive standard into IDEA's transition requirements.  The statute does not impose a separate FAPE requirement for transition plans.  Even a complete failure to develop an ITP does not deny a child a FAPE if the remaining portions of the IEP provide the requisite level of educational benefit, especially where there is no material difference between the child's transition needs and his current educational needs, as KISD urges is the case here.  *Bd. of Educ. v. Ross*, 486 F.3d 267, 276 (7th Cir. 2007)(where school district deferred in making an ITP because student had not progressed to the point where she needed one, the court found that the failure of the plan to discuss transition was a procedural flaw, not a substantive one; only procedural inadequacies that result in the loss of educational opportunity clearly result in a denial of a FAPE).[42]

_____

[42] This Court finds that the facts in *Ross* are easily distinguishable from the situation here.  In *Ross*, the school district stated that it had a practice of deferring the drafting of transition provisions when the student was not ready to move along and that it would wait until the student completed her vocational assessment and would then meet with the family to determine what areas of transition were needed.  486 F.3d at 276.  The court further relied on the rule that procedural flaws do not automatically require a finding of a denial of a FAPE unless they result in the loss of educational opportunity.  *Id., citing Heather*, 125 F.3d at 1059.  In Per's case, the ARD was all too ready to graduate Per and move him on past high school despite the absence of any specific transition goals in his IEPs.  Furthermore, this Court finds from a preponderance of the evidence that the lack of much needed transition assistance did deny Per a FAPE because he was unprepared in the most basic skills to go to college or get a job.  His progress at Landmark underscores that he has the capacity

The substantive prong of the *Rowley* test asks whether the IEP proposed for a student was based on the student's assessment and performance. *Bobby R.*, 200 F.3d at 347-48; *Michael F.*, 118 F.3d at 253. KISD argues that it developed an individualized program based on Per's assessment and performance with input and agreement from Per and his parents.[43] Insisting that Per's IEP was reasonably calculated to enable him to benefit educationally and that he received a FAPE, KISD charges that the Hearing Officer failed to analyze all four of factors in *Michael F.* in examining the IEP

---

for a meaningful educational benefit if provided with relevant services targeting his special needs.

[43] KISD points out that in the 2004-05 school year, when Per was in ninth grade, Per received instruction in English/Language Arts in a special education resource class with IEP objectives covering note-taking and summarizing, using graphic organizers, and writing paragraphs with topic sentence, main idea, and two to three supporting ideas. Per's parents expressed interest in mainstreaming him in a regular education class. In the next school year when Per was in tenth grade, the ARD Committee agreed to place Per in mainstream classes with recommended accommodations, including the opportunity to provide oral responses, extra time, reduced writing assignments, and the opportunity to type written work at home. Per passed all his classes and all three sections of the TAKS test, including the writing portion of the Reading/Language Arts TAKS. For his junior year, given the success of the previous year, the ARD Committee followed a similar plan, and again Per passed all his general education classes and two of the four sections of the exit-level TAKS test with Commended Performance, and passed the Math TAKS, but received only a "one" on written composition and therefore failed the English/Language Arts TAKS. The ARD further reached a consensus on following a similar plan for the next year. The IEP also included use of a word processor on the Writing TAKS and instruction in a Practical Writing class, which was designed to address the basic skills necessary to pass the written portion of the TAKS English/Language Arts test. Admin. Rec., Vol. I, pp. 262-63.

under the substantive prong of *Rowley*, i.e., whether Per received a FAPE.

The Hearing Officer found that Per's IEP was not appropriately individualized because (1) it did not contain goals and objectives to meet Per's unique needs; (2) it was not modified often enough; (3) it did not address issues with the portable speller provided to Per, which he refused to use during class where other students could see him; (4) it did not address issues with Per's handwriting; (5) it relied on Per's parents and family to help him at home; and (6) the transition plan was inadequate. Admin. Rec., Vol. I, at pp. 13-22. KISD disagrees. It details what it characterizes as a specifically individualized program developed year by year, ARD meeting by ARD meeting, by the school district, based on Per's assessment and performance, with the input and agreement of Pers and his parents. #17 at 5-19. It explains in detail how Per was given specific strategies and modifications to address his individual needs with an impairment in written expression from the time he moved from Norway and enrolled in KISD in the fifth grade until he withdrew in his senior year. KISD argues that even if the program failed to develop Per's skills to the level desired by him or his parents, that fact does not mean the IEP was not sufficiently individualized to meet his needs. *O'Toole v. Olathe Dist. Schs. Unified Sch. Dist. No. 233*, 144 F.3d 692, 708 (10th Cir. 1998). While the Hearing Officer criticized

Per's IEP because it was essentially the same from the fall of 2006 through May 2008 and the district failed to modify Per's curriculum, the district's teaching methods, or Per's goals or objectives, the Hearing Officer must have meant that modifications were in Per's only area of weakness, writing, and must have ignored all the areas in which Per exhibited strengths. *Bobby R.*, 200 F.3d at 350 (It is not necessary that the disabled student improve in every area to obtain an educational benefit from his IEP; educational benefits may be demonstrated by objective evidence of increased scores and grade levels). The undisputed evidence demonstrates that Per functioned at or above the level of his same-age peers in every academic area except writing. His achievement test scores and SAT scores[44] indicate that he is achieving at a very high level in the areas of mathematics, social studies, reading and science. Admin. Rec., Vol. I, at pp. 1118, 1120. Moreover, argues KISD, by requiring Per to master the same goals and objectives through regular mainstream education with non-disabled students, the ARD Committee was modifying Per's goals and objectives each year. Writing is taught in high school English classes, with curriculum changes each year, which would assist Per with his

---

[44] In the Fall of 2007 Per received a 650 on the Critical Reading SAT (89th percentile nationally and 92% statewide) and 640 on his Math SAT (top 6% nationally and statewide). On the written portion of the SAT he received a 340 (6th percentile nationally and statewide) with a raw score of 2 on the essay. Admin. Rec., Vol. I, at p. 1120.

writing problems.  When Per failed the writing portion of the EXIT level ELA TAKS test,[45] he immediately received additional specialized writing instruction and remained in the Practical Writing course throughout his senior year with individualized instruction for skills needed to pass the test.  Admin. Rec., Vol. II, at pp. 100, 114-16.  That Per did not finally pass the test does not mean that the District failed to respond to his needs; FAPE does not guarantee a particular outcome.  *Clear Creek ISD v. J.K.*, 400 F. Supp. 2d 991, 995 (S.D. Tex. 2005).  Nor is there any magic number of ARD meetings or modifications required, but only that the ARD Committee "review the child's IEP periodically, but not less frequently than annually, to determine whether the annual goals for the child are being achieved."  20 U.S.C. § 1414(d)(4)(A)(i).  Per's ARD Committee met seven times during his four years of high school.  Admin. Rec., Vol. I, at p. 916. Insisting that the Hearing Officer's real concern was the failure to give Per additional remedial instruction in the area of writing, KISD argues that removing Per from his general education classes in order to do so would have compromised his education in other areas and his right to be mainstreamed.  KISD further maintains that the Hearing Officer's reasoning is flawed because it presumes successful remediation could be achieved within the regular school year, even though Per's expert, Brett Hall of Landmark, testified

---

[45] Admin. Rec., Vol. I, at p. 1117-19.

that it could take years.  Admin. Rec., Vol. II, at p. 350, ll. 6-
20.

As for the portable speller, which the Hovems state was the
only special education service provided by KISD for Per's special
needs in spelling and writing, the Hearing Officer found that KISD
ignored teachers' reports that Per continued to struggle with
writing and that he refused to use his portable speller in class.
The IEP did not require Per to use it in class, but only to pass
all his courses "with or without the use of technology, portable
spelling device." Adm. Rec., Vol I, at p. 979 (11th grade), at p.
948 (12th grade).  When questioned by the District's Occupational
Therapist, Per always indicated it was successful for him, and his
good grades suggest it was.  Admin. Rec., Vol. II, at pp. 487-88.
During the due process hearing Per testified that he chose not to
use the device.  That Per chose not to use it in class is not
relevant; the District cannot force students to take advantage of
the education it offers.  *Austin ISD v. Robert M.*, 168 F. Supp. 2d
635, 640 (W.D. Tex. 2001)("Schools are not required to force or
motivate students to take advantage of the education they offer--
that is the parents' job."), *aff'd*, 54 Fed. Appx. 413 (5th Cir.
2002).[46]

───────────────

[46] This Court observes that it is virtually undisputed that in
class Per was an active class participant with a positive attitude.
While it was suggested that he did not like to draw attention to
himself in class by using the speller, there was substantially more
evidence that it was very inefficient for him--taking him up to

Although the Hearing Officer criticized KISD for not modifying the IEP after some teachers in 2006 stated that Per's handwriting was not legible, KISD contends that other teachers, including those in History and French, thought it was legible and that Per did not need the speller to progress in those classes.  Admin. Rec., Vol. I, at pp. 1095-96.  His disability just meant it took him longer to put his ideas on paper.  *See* KISD's discussion of Per's spelling, #17 at 39-40.   KISD maintains that its Occupational Therapist evaluated and documented similarities in the strategies used by Per's writing teachers in KISD and Landmark.  She also conducted numerous trials with different methods, devices and software to determine the most efficient method to help Per get his thoughts down on paper and concluded that he benefitted most from the use of classroom computers for production of written work, a detailed outline for the prewriting, and a phonetic spelling device with

---

twenty attempts to find an appropriate word.  Moreover despite clear references in his ARD Committee documents to reports from his teachers that he was not using the speller in class, Occupational Therapist Dawn McDonald claimed that she did not know until Per was in eleventh grade that he was not using it.  Due Process Hearing Transcript at 396.  Even then she stated that the choice was up to him and there was nothing she could do.  *Id.*.  Yet when questioned further, she said if Per had told her, "I would have looked . . . to see if there was any other way we could assist him, finding his words easier, another device maybe."  *Id.* at 415-16.

auditory feedback,[47] all of which were accommodations provided to him by KISD.  Admin. Rec., Vol. I, at pp. 1153-55, 1161-62.

The Hearing Officer complained that KISD encouraged Per to do his writing at home to get help from his family rather than from his teachers.  KISD said that while his teacher, Ms. Marek, did ask his parents to encourage Per to use the computer at home, as for a lengthy assignment for his senior memory book project, there is no evidence that any of Per's other teachers knew he was relying on his family to complete other work.  Per's mother testified that she spent little time helping Per with homework, and Per, himself, testified that he was never asked by a KISD teacher to get his

_____

[47] Although claiming that she ordered a speller with auditory feedback for Per in 2003, Occupational Therapist Dawn McDonald admitted at the Due Process Hearing (Transcript at 424-28) that in her first assessment of Per, she did not document that she thought it was the best device for Per's problem.  Petitioner's Ex. 5 at 110.  She stated that she thought she had ordered one with auditory feedback and one without, and after trying both, he chose the speller without the auditory feedback because of its size.  Yet she had no documentary evidence of that order and she conceded that she never mentioned a speller with auditory feedback to his parents or anyone else.  She also stated that between 2003 through the fall of 2008 she never brought up the subject again, even when a teacher said he was not using the device.  In her February 19, 2008 re-evaluation of Per, she wrote "additional evaluation not needed," and she made no recommendation for assistive technology or related services nor need of additional evaluation of Per.  Transcript at 434; Petitioner's Ex. 12 at 272-73.  Yet only in August 2008, after Per was no longer attending the school, and at the request of Dr. Rosenburg, did McDonald put a statement regarding a speller with auditory feedback in a written assessment for Per.  When asked what changed between February 2008 and August 2008, when the Hovems filed this suit, to make her conclude that Per needed assistive technology, she responded that she did not know, but was asked to come in when Marek brought Per's writing problems to the staff's attention.  Transcript at 435-36.

family to help him with assignments.  Admin. Rec., Vol. II, at pp. 286-87, 554, 552, 501.

The Hearing Officer's stated that Per completed his last two years of high school "with essentially no goals and objectives different from a non-special education child."  Admin. Rec., Vol. I, at p. 16.   KISD counters that mainstreaming is specifically mandated by the IDEA, as evidenced in the second prong, the least restrictive environment ("LRE"), of *Michael F.*'s four-factor test to determine if the IEP is reasonably calculated to provide a meaningful educational benefit.   The Hearing Officer failed to discuss this second prong.   The IDEA prohibits removal of a child with disabilities from the general education classroom unless "the nature or severity of the disability of a child is such that education in regular classes with the use of supplementary aids and services cannot be achieved satisfactorily."    20 U.S.C. § 1312(a)(5).   KISD maintains that Per performed satisfactorily, as indicated by the grades he received in English:  English 1 - 87/92; English 2 - 91/79; English 3 - 77/78; and English 4 - 81/83.  *See Corpus Christi ISD v. Christopher N.*, No. C.A. C-04-318, 2006 WL 870739, *8 (S.D. Tex. Mar. 31, 2006)(requiring placement in regular education even if academic benefits are not "ideal").   As the Supreme Court stated in *Rowley*, 458 U.S. at 202-03,

> When that "mainstreaming" preference of the Act has been met and a child is being educated in the regular education classrooms of a public school system, the system itself monitors the educational progress of the

child.   Regular  examinations  are  being  administered,
grades  are  awarded,  and  yearly  advancement  to  higher
grades  is  permitted  for  those  children  who  attain  an
adequate  knowledge  of  the  course  material.   The  grading
and  advancement  system  thus  constitutes  an  important
factor  in  determining  educational  benefit.   Children  who
graduate  from  our  public  school  systems  are  considered  by
our  society  to  have  been  "educated"  at  least  to  the  grade
level   they  have  completed,  and  access  to  an  "education"
for  handicapped  children  is  precisely  what  Congress
sought  to  provide  in  the  Act.

Under  the  third  factor  of  the  *Michael  F.*  test,  that  the

services  are  provided  in  a  coordinated  and  collaborative  manner  by

the  key  "stakeholders,"  KISD  states  that  it  has  two  duties:   (1)

the  ARD  Committee  must  develop  Per's  IEP  based  on  the  input  of

knowledgeable  individuals  and  (2)  it  must  "implement  substantial  or

significant  provisions  of  the  IEP."   *Pace  v.  Bogalusa  City  Sch.*

*Bd.*,  325  F.3d  609,  620  (5th  Cir.  2003),  *vacated*,  339  F.3d  348  (5th

Cir.  2003),  *rehearing  en  banc*,  403  F.3d  272  (5th  Cir.  2005),  *cert.*

*denied  sub  nom.  Louisiana  State  Board  of  Educ.  v.  Pace*,  546  U.S.

933  (2005);  *Bobby  R.*,  200  F.3d  at  349.   The  Hearing  Officer  found

there  was  no  evidence  that  Per's  IEPs  were  developed  without

collaboration  from  his  parents  or  that  his  teachers  were  not  highly

qualified  and  capable  of  meeting  his  unique  needs.   Admin.  Rec.,

Vol.  I,  at  pp.  11-12.   Nor  has  Per  objected  that  *any*  provisions,

much  less  substantial  or  significant  provisions  of  the  IEP,  were

not  implemented.   Admin.  Rec.,  Vol.  1,  at  pp.  6,  11-12.

KISD  points  out  that  the  Hearing  Officer  even  acknowledged

that  Per  "pass[ed]  all  of  his  classes  and  receive[d]  an  educational

benefit from those classes." Admin. Rec., Vol. I, at p. 18.  This finding contradicts his conclusion that KISD denied Per a FAPE. Instead the Hearing Officer concluded erroneously that because of Per's high IQ, Per was entitled to something more.  In *Adam J. ex rel. Robert J. v. Keller ISD*, 328 F.3d 804, 809-10 (5th Cir. 2003), the Fifth Circuit rejected the argument that an educational program denies a FAPE because it is not challenging to an academically gifted student:  "[C]ourts have repeatedly held that a FAPE need not be the best one possible, or the one calculated to maximize the child's educational potential; it only has to provide an educational opportunity designed to meet the student's specialized needs, with sufficient support services to allow him to benefit from the instruction." *See also Lewisville ISD v. Charles W.*, 81 Fed. Appx. 843, 847 (5th Cir. Dec. 4, 2003), in which the student's family argued that their child received no academic benefit because as a gifted child, he should have more than passing grades.  The panel in *Lewisville* rejects such an argument and pointed out that the Fifth Circuit had held "that a curriculum withstands a challenge under the IDEA by arguing that it is merely 'beneath [the child's] abilities.").  *Id., citing Adam J.*  KISD contends that Per's IEP was individualized to meet *his* needs and not those of a less intelligent student.  Furthermore, it argues, if a school district cannot avoid its duty to the student by claiming a lack of support in the home, why should the school's efforts be discounted

because the child's overall development is enhanced by strong family support?

   With respect to the issue of reimbursement for the Hovems' unilateral private school placement, KISD asserts that reimbursement is only proper if it is proven that Per's IEPs were inappropriate and that private school placement was proper. *Michael F.*, 118 F.3d at 252. Furthermore, before any expenses were incurred by the Hovems at Landmark, when Per became eighteen years old in November 2007, his parents' rights immediately transferred to him and he became the only party in the proceeding, as recognized by the Hearing Officer. Admin. Rec., Vol. I, at p.50. KISD contends that there is no provision in the IDEA that allows a party to sue for expenses incurred by non-parties; when Per became an adult, the parents became non-parties. *Emery v. Roanoke City Sch. Bd.*, 432 F.3d 294, 299 (4ᵗʰ Cir. 2005)(denying reimbursement to adult student for expenses incurred by his father because the student suffered no out-of-pocket expenses himself).[48]

_____

   [48] In *Emery*, the situation was more complex than KISD suggests. A brain-damaged student with behavioral problems was placed in a private hospital that had a school after his local public school district failed to provide him with a FAPE.  The father's medical insurance paid for the hospital bills which included the plaintiff's education, so the plaintiff incurred no expense for his education.  Long after the plaintiff was no longer a student, he sued under the IDEA, seeking retroactive reimbursement for the expenses.  The Fourth Circuit noted that the IDEA does not allow for compensatory or punitive damages, but that a court can equitably reimburse parents for funds spent on their child's education if the school district fails to provide the child with a FAPE. *Emery*, 432 F.3d at 298, *citing* § 1415(e)(2)(the court "shall

grant relief as [it] determines is appropriate"). It observed that the disabled child is the real party in interest, and that while the IDEA provides his parents with procedural rights to force the district to comply with the statute, "these rights stem solely from the disabled child's inability to pursue a remedy due to his incapacity." *Id.* at 299. The appellate court opined that the disabled plaintiff did not seek and no longer had a claim for injunctive relief to compel a suitable education because he was past the age where he would qualify for a FAPE. *Id.* at 300. While the IDEA allows for reimbursement of funds that the child or his parents expended to provide the education that was the school district's responsibility, the standing doctrine mandates that reimbursement should go to the party that expended the resources, whether the parent or the child, usually the former. *Id.* It found that the plaintiff did not suffer any out-of-pocket losses since the father's medical insurance provided by his employer paid for the expenses. Moreover, the plaintiff failed to show that awarding him the amount in reimbursement would not be a windfall. Furthermore, he had not shown that he had failed to obtain appropriate care because of any diminution in his father's lifetime insurance benefits. His current insurance coverage is different from the one used to pay the hospital, and he did not demonstrate that any payment under his father's policy had lessened the benefits the plaintiff enjoys or would enjoy in the future under his current plan. Thus the Fourth Circuit held that the plaintiff had no standing because he had no legally cognizable injury. The appellate panel further stated that his parents could no longer seek reimbursement because of the two-year statute of limitations, but had they filed suit timely and had they been able to demonstrate out-of-pocket loss, since they had not paid the hospital bills directly, the decision implies they could have sued. Here no one has argued that the Hovems would be directly responsible for Per's tuition if reimbursement is ordered.

This Court notes also that since *Emery* issued, the United States Supreme Court held in *Winkelman v. Parma City Sch. Dist.*, 550 U.S. 516 (2007) that because the IDEA includes provisions conveying substantive rights, not just for reimbursement, to parents, parents are entitled to prosecute IDEA claims in federal court, on their own behalf, jointly with their child, as well as on the administrative level. It determined that various provisions "accord parents independent, enforceable rights" under the IDEA, that parents are also real parties in interest, that the statute provides for "expansive review and extensive parental involvement," and that a parent may be "a party aggrieved for purposes of § 1415(i)(2) with regard to 'any matter' implicating these rights." *Id.* The Court does not recognize a bar here to Per's suing with

Regarding the statute of limitations applicable to requests for a due process hearing, KISD argues that the Hearing Officer erroneously determined that Per was entitled to a two-year period as an adult student since he was eighteen[49] at the time of his hearing.   KISD notes that Per executed and filed a power of attorney to transfer to his parents his right to prosecute the due process hearing.  Admin. Rec. Vol. I, at pp. 40-42.  The Hearing Officer determined that Per's parents' rights under the IDEA were not revived by the power of attorney.  Admin. Rec., Vol. I at p. 32 (finding the power of attorney merely gave parents the authority to act on behalf of their child).  KISD insists that the IDEA mandates that all of a parent's authority transfers to the student when he reaches the age of majority under State law unless the child with the disability has been declared incompetent under State law.  20 U.S.C. § 1415(m).  *See also* 19 Tex. Admin. Code § 89.1049(a)(single exception to the transfer of rights is when "the student's parent or other individual has been granted guardianship of the student under the Probate Code, Chapter XIII, Guardianship").  KISD points out that there is no evidence that Per is not a competent adult or that his parents had been granted guardianship, so the parents' rights transferred to Per by operation of law when he turned

---

his parents for reimbursement.

[49] Per turned eighteen in November 2007.

eighteen (19 Tex. Admin. Code § 89.1949(a)).  KISD reiterates that because Per, himself, suffered no out-of-pocket expense, he was not entitled to reimbursement, and the Hearing Officer had no authority to order KISD to reimburse his parents, who were not parties to the proceedings.

Even if the Court decides the educational expenses are reimbursable, KISD also contends that the Hearing Officer erred in deciding that the residential portion of the expenses of the Landmark School placement were reimbursable because they were not "necessary to provide special education and related services" in accordance with 34 C.F.R. § 300.104. [50]

KISD also insists that Landmark School is not an appropriate placement because (1) the evidence shows that the IEP developed by KISD provided Per with the requisite educational benefit and (2) Per failed to establish that Landmark met the requirements set forth by his expert.  KISD argues that even though the Hearing

---

[50] KISD originally cited *Richardson ISD v. Michael Z.*, 561 F. Supp. 2d 589 (N.D. Tex. 2007)(finding residential portion of placement was reimbursable where the student's needs for residential placement were inextricably intertwined with her educational needs).  It withdrew this argument in its Supplement (#47), pointing to a new Fifth Circuit case that rejected the inextricably intertwined test and applied a new test:

> In order for a residential placement to be appropriate under IDEA, the placement must be 1) essential in order for the disabled child to receive a meaningful educational benefit and 2) primarily oriented toward enabling the child to obtain an education.

*Richardson ISD v. Michael Z.*, 580 F.3d 286, 299 (5th Cir. 2009).

Officer rejected significant amounts of Dr. Marshall Shumsky's testimony as lacking credibility, the Hearing Officer adopted Dr. Shumsky's conclusion that Landmark was the only school in the United States that could meet Per's needs even though it did not offer the kind of 7-day a week program that Dr. Shumsky also testified was necessary to remediate Per's disability.  Admin. Rec., Vol. I, at p. 23; Vol. II, at pp. 192, 360-61.[51]

Finally, even if the Court determines that Per is entitled to reimbursement, KISD argues that the Hearing Officer erred in determining the Per was entitled to two years of relief based on the mistaken conclusion that Per was entitled to a two-year statute of limitations period.  Admin. Rec., Vol. I at pp. 50-51, 19, 27. KISD contends that the Hearing Officer erred in concluding that the one-year limitations period under 19 Tex. Admin. Code § 89.1151, applicable to due process hearings filed by parents in Texas, did not apply to Per as an adult student.  Per's right to file a due process hearing derives from the transfer of that right from his parents.  19 Tex. Admin. Code § 89.1049; Tex. Educ. Code § 29.017. KISD insists that the adult student has only the same right that his parents previously possessed, and the same one-year limitations period applies to Per.

---

[51] The Court observes that KISD ignores the testimony of Brett Hall and Marie Mirandi, in addition to Per's, and the documentary evidence in the record.

**Hovems' Response and Motion for Judgment (#39, modified by #41)**

The Hovems identify as the single issue on appeal whether the Hearing Officer's decision should be affirmed or reversed.[52]

As a threshold matter, the Hovems raise a legal argument about the appropriate current standard to measure "academic benefit" under the IDEA. They describe the origin and development of the IDEA out of what was first titled The Education of the Handicapped Act of 1975 ("EHA"), Public Law 94-142, which focused on ensuring that children with disabilities had access to an education and to due process of law. The EHA had no significant discussion of transition services or transition planning. In 1982, the Supreme Court in *Rowley* established the "basic floor of opportunity" standard for what determines "academic benefit," which emphasized access to educational services, not outcome. In 1990 amendments, the EHA was renamed the IDEA, Public Law 101-475, and it added the requirement for transition services to promote movement from school to post-graduation activities. Its Findings and Purpose sections continued to emphasize access to education.

The Hovems contend that substantial changes were made in the amendments in 1997 and 2004. In 1997 Congress declared the goal of

---

[52] The Hovems incorporate their Petitioners' Closing Brief, Admin. Rec., Vol. 1, pp. 243-53.

access to education had been met and shifted its focus to "improving educational results . . . . [and] ensuring equality of opportunity, full participation, independent living, and economic self-sufficiency for individuals with disabilities."  Congress observed that "implementation of the Act had been impeded by 'low expectations'" and wanted to insure that the focus for the first time would now be on "opportunities to achieve standards and goals."  64 Fed. Reg. 12405, 12470-71 (March 12, 1999).  The amendments also contain provisions that increased the involvement of the disabled students in decisions regarding their futures to facilitate movement from school to post-school activities.  20 U.S.C. § 1414(d)(3)(A); 34 C.F.R. § 300.346.  In 2004 the Purpose section reflected evolving policy concerns about preparing children with disabilities for "further education, employment and independent living."  These changes made the outcome important, and mere access to an educational program insufficient, argue the Hovems, thereby requiring modification of the "basic floor of opportunity" standard established in *Rowley*:

> . . . to ensure that all children with disabilities have available to them a free appropriate public education that emphasized special education and related services designed to meet their unique needs and prepare them for further education, employment and independent living and to ensure that the rights of children with disabilities and parents of such children are protected. . . .

20 U.S.C. § 1400(d)(1).

The Hovems further argue that the definition of "Transition Services" (see footnote 29 of this opinion and order) now emphasizes that the Transition Plan must be a "results-oriented process" involving "post-secondary education" "based on the individual child's needs" to "facilitate [his] movement from school to post-school activities," and include "instruction"; in other words, Per's Transition Plan was deficient because it was not individualized and did not deal with his problems in handwriting, written expression, spelling, phonetics, omitting entire words when writing, and ability to effectively transfer his ideas from his mind to paper and to provide services to effectuate the desired outcome. Because the ARD Committee knew that Per's impairment was so severe that he could take days to write a paragraph and over a week to complete one page, a viable Transition Plan for Per would have to address practical, day-to-day, and community living problems, such as taking a simple phone message, writing a shopping list, taking notes for school or writing directions. It must also address his failure to pass the written expression portion of the TAKS and meet his IEP and transition plan goals to graduate high school. Because the Transition Services Plan did nothing to address these matters, they insist that it was both procedurally and substantively deficient, as the Hearing Officer determined. The Hovems complain that the Transition Services Plans completed in September 2006 and 2007 consist of a two-page check-the-box

document with no discussion about Per.  It is a document used for all students, with the only thing on it relating to Per, individually, being his name, and that it was full of boilerplate language.

The Hovems argue simply that Per is unable to write and unable to spell, two disabilities that KISD failed to address with an individualized IEP or an individualized Transition Plan.  As a result, Per failed the written part of the TAKS test three times over a three-year period.  While KISD asserts that Per failed by only one point each year (#17 at 14 n.19), the Hovems maintain that everyone who fails this section fails by one point, regardless of the actual raw score he received on the test.  #39 at p. 18, ¶ 60, citing Admin. Rec., Vol. II, p. 111, ll. 15-24 through p. 112, ll. 1-11 (Thomas Greer's testimony).  Plaintiffs note that all public school students in Texas are required to pass the exit exam in order to move on to the next level, from one grade to the next, and in Per's case, to graduate from high school.  They accuse the district of taking the easy route of not changing his original IEP to address the problem despite the Hovems' protests and instead by granting Per, as a recipient of special education services, a waiver from having to pass the TAKS test.[53]  Moreover, after he

---

[53] 19 Tex. Admin. Code § 89.1070(b)(graduation options for special education students); Admin. Rec., Vol. I, at p. 953 (Transition Plan indicating regular graduation options with or without passing the exit level TAKS test).  The Hovems point out that if a school wants to waive a state-wide exam for a student

failed the English Language Arts portion of the TAKS test, he was put in a class that was provided to all students who failed, and his teacher testified that the class met once a week and could not solve Per's individual problems in spelling, grammar, and phonics. Admin. Rec., Vol. II, p. 100.

The Hovems argue that application of the four-part test under *Michael F.*[54] shows that KISD did not satisfy the *Rowley* requirements of (1) compliance with procedures set forth in the IDEA and (2) an Individualized Education Plan reasonably calculated to enable the child to receive educational benefits.

The Hovems address the Hearing Officer's finding of procedural violations that caused the loss of an educational opportunity for Per and thus failed to provide Per with a FAPE.

First, the Transition Services "must be based upon the child's individualized needs, including measurable goals, and be results-oriented."  20 U.S.C. § 1414(d)(1)(A)(VIII); 34 C.F.R. § 300.43.

---

receiving special education services, it must do so through the student's ARD Committee, state why the student cannot take the regular assessment, and what alternative assessment is selected. KISD did not follow this procedural requirement. 34 C.F.R. § 300.320(a)(6)(ii).

[54] As indicated earlier, the four factors, which the Hovems state "refine" the *Rowley* standard, are (1) that educational services be commensurate with the student's unique and individualized needs; (2) that the services be provided in the least restrictive environment; (3) that the student's IEP be developed by key stakeholders in a collaborative manner; and (4) that the student receive "demonstrable academic and non-academic benefits" from the IEP. *Michael F.*, 118 F.3d at 252.

Per's Transition Plan contains only general information and a
check-box format that does not satisfy the requirement.  There was
no "coordinated set of activities designed within a results
oriented process that is focused on improving the student's
academic and functional achievement to facilitate the student's
movement from school to post-school activities." Admin. Rec., Vol.
I, at pp. 697-98.

Furthermore Per's IEP was also procedurally flawed, argue the
Hovems.  It did not change over the years to reflect Per's ongoing
problems and his repeated failure on the TAKS test, as required by
34 C.F.R. § 300.324.  Moreover his IEP required that Per pass his
classes with a 70% grade, which was non-individualized, had nothing
to do with Per's Learning Disability in the area of written
expression, and was a goal for all non-special education students
who sought to graduate.  34 C.F.R. § 300.320.  The IEP also
required that Per use a portable speller, but the goal of helping
him with spelling was not met because all of his teachers reported
in an Occupational Re-Evaluation as early as 2006 that he did not
use it. Admin. Rec., Vol. I, P. 669; Vol. II, pp. 59, 395-96.  The
Hovems further complain that the speller is not "measurable," in
violation of IDEA04 (34 C.F.R. 300.320(a)(2) and (3)(i), nor does
it address the core problems associated with Per's Learning
Disability.  They maintain that the school district was also
procedurally deficient and violated 34 C.F.R. § 300.320(a)(6)

because it did not have any statement in Per's IEP about his failing the TAKS test, nor any description as to why he did not need to take the test, nor any alternative suggestions. They complain that KISD also failed to have an IEP in place for Per at the beginning of the 2007-08 school year. 20 U.S.C. § 1414(d)(2)(A-C). 34 C.F.R. § 300.323.

Still another procedural violation was KISD's failure to satisfy the "prior written notice" requirements of the IDEA when it refused to make changes that Per and his family requested during the relevant time period in this case. 34 C.F.R. § 300.503. When KISD refused to place him or provide the services requested, there is nothing in the record to demonstrate that the district met the requirement to provide the Hovems with the following, all factors that went into the Hearing Officer's determination that Per's IEP was procedurally inadequate (#41 at 22):

(1) A description of the action proposed or refused by the agency;

(2) An explanation of why the agency proposes or refuses to take the action;

(3) A description of each evaluation procedure, assessment, record or report the agency used as a basis for the proposed or refused action;

(4) A statement that the parents of the child with a disability have protection under the procedural

safeguards of this part and, if this notice is not an initial referral for evaluation, the means by which a copy of the description of the procedural safeguards can be obtained;

(5) Sources for parents to contact to obtain assistance in understanding the provisions of this part;

(6) A description of other options that the IEP Team considered and the reasons why those options were rejected; and

(7) A description of other factors that are relevant to the agency's proposal or refusal. A review of the record would denote that the school failed to satisfy this "notice" mandate and that, too, is considered a procedural violation.

They maintain that the record reflects that the school failed to give Per a copy of the "Procedural Safeguards" (Admin. Rec., Vol. II, p. 37), another violation. 20 U.S.C. § 1415(m); 34 C.F.R. § 300.520, § 300.504.

As for *Rowley*'s and *Michael F.*'s second prong, an IEP and Transition Plan reasonably calculated to enable the child to receive educational benefits, both academic and non-academic, the Hearing Officer found that the IEP and Transition Services Plan failed to confer academic benefit on Per. The Hovems argue that there is no evidence that Per received any non-academic benefits

from his IEP, either.  A FAPE is defined as "special education <u>and</u> related services [emphasis added]."   20 U.S.C. §§ 1401(8), 1312(a)(1); 34 C.F.R. §§ 300.13 and 300.300.

The Hearing Officer found that Per's Transition Plan was deficient procedurally and substantively because its goal was merely to have Per pass his classes and graduate high school like other students.   The Hovems insist the Transition Plan was necessarily deficient because it failed to address Per's individualized needs, i.e., to learn how to write well enough to actually pass the handwriting and written expression portion of the TAKS test.

Regarding reimbursement for Landmark School expenses, the Hovems insist they have standing and that the statute speaks plainly that parents can seek and receive reimbursement for such costs.[55]   *See Winkelman v. Parma School Dist.*, 550 U.S. 516, 517-18

---

[55] 34 C.F.R. § 300.148(c) states,

Reimbursement for private school placement.  If the parents of a child with a disability, who previously received special education and related services under the authority of a public agency, enroll the child in a private school, elementary school or secondary school without the consent of or referral by the public agency, a court or a hearing officer may require the agency to reimburse the parents for the cost of that enrollment if the court or hearing officer finds that the agency has not made FAPE available to the child in a timely manner prior to that enrollment and that the private placement is appropriate.

(2007)[56](The "IDEA grants parents independent enforceable rights. These rights, which are not limited to certain procedural and reimbursement-related matters encompass the entitlement to a free appropriate public education for the parents' child.").[57]   T h e Court agrees with the Hovems that the parents have the right to seek reimbursement of their expenses if Per was denied a FAPE and the placement at the Landmark School is appropriate.   Pursuant to Section 1415(e)(2) of the IDEA,[58] a TEA Hearing officer has equitable authority to order reimbursement for private placement or other compensatory services or any issue "that justice may require."  89 T.A.C. § 11.70(b).  Moreover, Texas law requires a parent to support a child with a disability past its eighteenth birthday and thus supports reading the statute to provide parents with the right to seek and receive reimbursement for such costs.

---

[56] The specific holding of *Winkelman* is that nonlawyer parents of children with disabilities may litigate their children's claims in federal court *pro se*.  The majority found that these rights "are not limited to certain procedural and reimbursement-related matters" and encompass the entitlement to a [FAPE] for the parents' child."  *Id.* at 533.

[57] KISD argues that this case involved a minor and does not apply where the student has reached majority, as Per did.  Under Texas law, which the IDEA expressly allows to control, all Per's parents' rights transferred to him when he achieved the age of majority.   20 U.S.C. § 1415(m); 19 Tex. Admin. Code § 89.1049(a)(transferring IDEA rights to adult student).

[58] In *Rowley*, the Supreme Court stated that the IDEA gives courts authority to "grant such relief as the court determines is appropriate."  471 U.S. at 369.  *See also Florence County School Dist. v. Carter*, 510 U.S. 7, 16 (1993)(courts may fashion equitable relief under the IDEA).

The Hovems, or any person who provides out-of-pocket costs for Per's education, could seek a third party claim or ask that their claim be subrogated in an effort to be made whole.  They insist there is no case law that states that a parent does not have standing to be reimbursed for out-of-pocket expenses incurred on behalf of their children, regardless of age, and "[o]ne would be hard-pressed to find any eighteen (18) year old who would be able to pay their own costs of a compensatory education."  They assert that KISD's argument makes no practical sense and has no legal basis.  Furthermore, they point out that in earlier proceedings in this case, the school district paid the Hovems for the costs of Per's education at the Landmark School and insist that the school district cannot now argue that the Hovems do not have standing. Thus the Hearing Officer's determination that the parents do not have standing should be reversed.  Even if the court concludes that the Hovems lack standing, they should still be reimbursed for reasons stated.  Alternatively, Per should be allowed to assert the claim.

At the administrative level, Per Hovem argued that the two-year statute of limitations under 20 U.S.C. § 1415(f)(3)(C) applies to him because the state statute, 19 T.A.C. § 89.1151, does not specifically address what should happen when a student turns eighteen regarding filing a request for a due process hearing; therefore the two-year period contemplated by federal law is the

default standard for Per's claims.[59]   The Hearing Officer agreed.
The school district argues that the one-year period in the Texas
statute controls.   A student receiving special education services
may remain in public school until he is past twenty-two years old.
19 T.A.C. § 89.1023.   The Hovems argue that it would be rare for
and eighteen-year-old, after living a lifetime of dependence, to
know to file a complaint against his school.   Furthermore, the
statute of limitations for IDEA (then the EHA) claims in Texas was
previously two years, based on state law when construing civil
rights actions under § 1983 and when the federal statute had no
statute of limitations. *McDowell v. Ft. Bend ISD*, 737 F. Supp.
386, 389 (S.D. Tex. 1990).   On August 1, 2002, the TEA promulgated
a new rule at 19 T.A.C. § 89.1151(c) changing the two-year
limitations period to one year.   Subsequently in *Texas Advocates
Supporting Kids with Disabilities v. TEA*, 112 S.W. 3d 234, 236
(Tex. App.--Austin 2003, no pet.)(explaining that the one-year
limitations was passed because the TEA "determined that the longer
it takes to resolve differences through a due process hearing and

---

[59] Section 1415(f)(3)(C) provides,

A parent or agency shall request an impartial due process
hearing within 2 years of the date the parent or agency
knew or should have known about the alleged action that
forms the basis of the complaint, or if the State has an
explicit time limitation for requesting such a hearing
under this subchapter, in such time as the State law
allows.

subsequent suit for judicial review, the greater the potential damage to the child's education"), the appellate court held that the one-year limitations period was legally promulgated by the TEA. In June of 2004, Congress passed the 2004 amendments to the IDEA and discussed the two-year limitations period for a parent or school district to file for a due process hearing. The Texas rule has remained the same since 2002 and Texas has failed to adopt the language of the federal statute. The Hovems argue that while the one-year limitations period was legally sufficient before 2004, TEA would have to re-authorize the rule with new language regarding the exceptions noted in 20 U.S.C. § 1415(f)(3)(D), but it did not. Therefore the two-year limitations period should control.[60]

Alternatively they assert that the one-year limitations period for special educations cases is fundamentally unfair because it does not apply to any other of the various methods available to resolve disputes between parents and the school districts. The Hovems make various other arguments which the Court finds unsupported by legal authority and unpersuasive, so it will not repeat them here. In sum, they argue that the one-year period

---

[60] This Court disagrees. The legislative history of the 2004 amendments, which added the first statute of limitations to the IDEA, reflect a clear concern to have IDEA disputes resolved quickly. *See generally* Lynn M. Daggett, Perry A. Zirkel, and LeeAnn L. Gurysh, *For Whom the School Bell Tolls But not the Statute of Limitations: Minors and the Individuals with Disabilities Act*, 1 U. Mich. J. L. Reform 717 (Summer 2005). The Texas rule, 19 T.A.C. § 89.1151(c), is based on the same intent.

discriminates against disabled students and leads to absurd results. They want the two-year statute of limitations applied and the Hearing Officer's decision on limitations to be affirmed. They contend that the Hearing Officer has the authority to seek a remedy pursuant to the specific needs of the student, regardless of the limitations question, for multiple years of educational deficiencies. *Alexandra N. v. Desoto ISD*, Civil No. 3:04-CV-2513-H, 2005 U.S. Dist. LEXIS 15122, *9 (N.D. Tex, July 25, 2005)(finding a court "ought to be able to fashion an appropriate remedy to compensate a student for an education agency's failure to provide a free appropriate education")(citing 20 U.S.C. § 1415(i)(2) and 34 C.F.R. § 300.512), *citing Reid ex rel. Reid v. Dist. of Columbia*, 401 F.3d 516, 521-26 (D.C. 2005)(finding that trial judges in IDEA cases have broad discretion to hear additional evidence and fashion "appropriate relief" for equitable reasons; awarding compensation for an educational deficit of four years)(*citing Carter*, 510 U.S. at 15-16)); *Mewborn ex rel. N.V. v. Gov't of Dist. of Columbia*, 360 F. Supp. 2d 138, 143 (D.D.C. 2005)("The right to compensatory education accrues when the school district knew or should have known that a disabled child was not receiving a free and appropriate education"). *See also Ridgewood Bd. of Education v. N.E. ex rel. M.E.,* 172 F.3d 238, 250 (3d Cir. 1999).

The Hovems observe that the Hearing Officer found Landmark School to be an appropriate placement for several reasons.  First, it specializes in dealing with highly intelligent students who have language disabilities.  Admin. Rec., Vol. II, pp. 179, 335).  It use a specific teaching method, called Lindamood-Bell, specifically the Lindamood Phoneme Sequencing Program ("LiPS"), which uses a multi-sensory approach to problems with auditory processing of language such as those afflicting Per.  *Id.* at pp. 138, 311, 366-67.  *See also* Vol. I, Petitioners' Ex. 12, at pp. 793-99.  This teaching method is peer reviewed and scientifically based.  *Id.* at pp. 138-40, 355, 366-67.  At Landmark School Per receives a daily one-on-one tutorial session specifically directed to his disability.  *Id.* at pp. 311-12.  Unlike at Klein ISD, all of Per's classes are structured so that language skills are exercised during the entire course materials and are highly individualized as to Per.  Admin. Rec., Vol. I, p. 745; Vol. II, pp. 347-48, 333.  Although Per's ARD Committee disagreed with Per's placement there, no one from Klein ISD ever investigated the Landmark School to determine whether it was appropriate for Per.  The Hearing Officer noted that KISD basically did not challenge the evidence presented by Per's expert, Dr. Marshall Shumsky, and found that the Landmark School was appropriate for Per, while Klein School District was not.

In sum, the Hovems ask the Court to deny KISD's motion for summary judgment and to grant their motion for judgment based upon the administrative record.  In particular they ask the Court to affirm the Hearing Officer's decision regarding the following matter:  KISD's failure to satisfy the procedural requirements of IDEA 2004 by, among other things, failure to have a transition plan with appropriate goals crafted around Per's unique and individualized needs, failure to develop an appropriate IEP for Per, and failure of the IEP to confer an educational benefit on Per, and the placement of Per at the Landmark School was appropriate.  They further request the Court to affirm the Hearing Officer's decision requiring reimbursement of the Hovems for all costs incurred in Per's placement at the Landmark School, past, present, and future.  They also ask that their request for reasonable attorneys' fees and costs as "prevailing parties" in the underlying administrative action and through proceedings in this Court.

## KISD's Reply (#43)

Because the Court has set out its interpretation of controlling law in this Circuit, it does not repeat KISD's disagreement with the Hovems' legal authority.

The one exception is KISD's challenge to the Hovems' argument that the 1997 and 2004 IDEA amendments require modification of the *Rowley* standard for a FAPE of a "basic floor of opportunity" with

access to specialized instructions and related services which are individually designed to provide educational benefit." 458 U.S. at 201. This Court fully concurs with KISD that the Fifth Circuit has continued to apply *Rowley*. *K.C. b/n/f M.C. v. Mansfield ISD*, 618 F. Supp. 568, 574-76 (N.D. Tex. 2009)(and cases cited therein); *see also discussion in J.L. v. Mercer School Dist.*, 592 F.3d 938, 947-51 (9th Cir. 2010)(agreeing with First Circuit that "there is no plausible way to read the definition of transition services as changing the free appropriate education standard" and continuing to apply *Rowley*), *citing Lt. T.B. ex rel. N.B. v. Warwick Sch. Comm.*, 361 F.3d 80, 83 (1st Cir. 2004).

According to KISD, although the Hovems argue that KISD is required to develop a transition plan that cured Per's writing disability and ensure the he passed the TAKS test, KISD insists that under the *Rowley* standard Per received extensive educational benefits in the KISD program: even the Hearing Officer acknowledged that Per "pass[ed] his classes and receive[d] an educational benefit from those classes." Admin. Rec., Vol. I, at p. 18. *See also Bobby R.*, 200 F.3d at 349-50 (finding the student does not have to show progress in every area to obtain an educational benefit); *J.K.*, 400 F. Supp. 2d at 996 ("The standard for an IEP is whether the instruction and services provide some benefit to the student. . . . An IEP and its implementation cannot

be judged based on a student's progress or regression on a single objective, even an important one.").

KISD addresses the four-prong test for a FAPE, established in *Michael F*, 118 F.3d at 247, which it claims the Hovems ignored. First, KISD insists that Per's educational program was individualized on the basis of his assessment and performance. While the Hovems argue that § 29.003(a) of the Texas Education Code mandates that "special education instruction shall be supplemented by provision of related services," KISD points out that the statute requires those services only "when appropriate." Tex. Educ. Code § 29.003(a). Similarly the IDEA and its implementing regulations require provision of related services "as may be required" to assist the child to benefit from his education. 20 U.S.C. § 1401(26)(A). Thus whether to provide such related services is an individualized decision based on the educational needs of the child. While Per did not receive direct related services, his use of assistive technology was monitored by the occupational therapist up to his senior year, when those services were discontinued by unanimous consent of his parents and the school-based members of the ARD Committee. The ARD Committee did not deem any other related services to be necessary, and the suggestion that some unspecified additional related service would have eliminated his writing disability is speculative at best. While the Hovems argue that Per's IEP was not adequately individualized because it was so

"very (very) simple" in requiring him to pass all his classes and use a portable speller and because he failed the EXIT level Writing TAKS test, KISD responds that requiring a special education student to master the same curriculum as a non-disabled student, especially that in the area of his disability, is not a simple goal, and that the severity of his disability did not warrant removing him from general education classes. The requirement that an IEP be individualized is not the same as requiring the child's education to be focused on the areas most impacted by his disability--all the other subject areas are equally important to a well rounded education for attending college as the ability to write. That Per's educational experience in KISD is marked by numerous successes and a single failure does not equate to the denial of a FAPE.

The second prong of the *Michael F.* test, the least restrictive environment, was also applied to Per individually. In his freshman year he attended a special education class for writing instruction with specific goals and objectives selected from the State's writing curriculum. Admin. Rec., Vol. I, at pp. 613-14, 572. During the ARD Committee meeting at the beginning of that year his parents requested that Per receive his writing instruction in a regular education classroom. The ARD Committee agreed to a provisional enrollment for the spring semesters, and Per received a grade of 92. Admin. Rec., Vol I, at p. 1116. The next year the

ARD Committee, without objection from the Hovems, agreed to continue the regular education placement, in which Per continued to perform "satisfactorily" by passing all his classes and TAKS testing with one exception, the written portion of the exit level ELA TAKS, which KISD urges should not render his entire educational experience in the school district meaningless.  The Court should find this prong weighs in favor of KISD.

KISD further maintains that, in accord with the third prong of *Michael F.* for an FAPE, Per's IEP was developed and implemented in a coordinated and collaborative manner with parents and qualified teachers.  The Hearing Officer stated there was no evidence that it was not.  Defendants do not argue that any of the provisions, no less substantial or significant provisions, of the IEP were not implemented.  KISD should prevail on this prong, too.

Finally regarding the last prong, that the student receive both academic and non-academic benefits from his educational program, a school district may not remove a child from the mainstream solely to increase a child's level of academic achievement; the benefits of mainstreaming go beyond the academic realm and include language and behavior models.  *Daniel R.R. v. State Board of Educ.,* 874 F.2d 1036, 1047 (5th Cir. 1989).  While KISD offered Per tutoring to supplement his writing instruction during twelfth grade, he chose not to attend a single session.  Admin. Rec., Vol. II, at p. 299 (testimony of Ms. Marek, ELA

teacher), p. 108 (testimony of Mr. Greer,[61] practical writing teacher).   The focus of the *Rowley* requirement that the IEP be reasonably calculated to enable the child to receive educational benefits is on academic achievement.  *White ex rel. White*, 343 F.3d at 378.  KISD maintains that passing classes is a strong indication of academic benefit that militates a finding in favor of the school district that the student's IEPs were appropriate under the IDEA. *Adam J. ex rel. Robert J.*, 328 F.3d at 810.   The Hearing Officer believed that the grades Per received were genuine.   Contrary to Defendants' charge that the record is devoid of evidence of non-academic benefits, KISD insists it was Defendants' burden to establish a lack of benefits.   Regardless, the Hearing Officer considered and rejected Defendants' argument that Per had any non-academic needs that needed to be addressed by the ARD Committee. Admin. Rec., Vol. I, at p. 11.   Per did receive the benefits of mainstreaming discussed in *Daniel RR.* and he clearly received a FAPE under the *Michael F.* test.

As for alleged procedural violations, KISD argues that they only constitute a violation of the school's duty to provide a FAPE if they (1) impede the child's right to a FAPE, (2) significantly impede the parent's opportunity to participate in the development

---

[61] The Court notes that Greer testified during the Due Process hearing that Per came for three or four tutoring sessions during tenth grade after Per's mother requested that he tutor Per.  Admin. Rec. Vol. II, p. 93 at l.10, pp. 89-90.  Per passed the TAKS test that year, but failed it during the next two years.

of the IEP, or (3) cause a deprivation of educational benefit.   34 C.F.R. § 300.513(2).   KISD argues that the Hearing Officer erred in determining that KISD committed procedural violations, and that even if it did, Per cannot establish that any procedural violation rose to the level of a denial of a FAPE.

Defendants allege numerous procedural violations that KISD maintains are not supported by the administrative record or not supported by law.   For example Defendants argue that the check-box format in the transition plan is inadequate under the IDEA,[62] when the IDEA does not prescribe or prohibit any particular form and despite the fact that Per's transition plan addressed every area of need, as required by the statute.   34 C.F.R. § 300.320(b).   The transition plan also provided the ARD Committee with multiple ideas and options as well as sufficient opportunity for the Committee to

---

[62] In a footnote KISD points out that two cases cited by the Hovems for the proposition that a check-box format is insufficient actually support KISD's insistence that the format is adequate.   In *Brett S. b/n/f Charles and Susan S. v. The West Chester Area Sch. Dist.*, Civ. A. No. 04-5598, 2006 U.S. Dist. LEXIS 10249, *28 (E.D. Pa. Mar. 14, 2006), the Court was quoting an expert retained by the parents who said "the case-law is clear that a check-the-box document or one that relies upon boilerplate language . . . fails to be sufficiently individualized."   The Court rejected that expert's opinion and found the IEP developed by the school district was appropriate.   *Id.* at *52.   In *P.G. o/b/o C.B. v. Southern York Co. Sch. Dist.*, Civ. No. 1:04-CV-2221, 2006 U.S. Dist. LEXIS 77197, *5 (M.D. Pa. Oct. 24, 2006), a parent characterized the child's IEP as "vague, boilerplate instructions that failed to give guidance to C.B.'s teacher."   The hearing officer in that action determined that the IEP was inadequate because of deficiencies in the "reading components," but his decision was overturned when the district court found that the school district had provided the student with a FAPE.   *Id.* at *21.

formulate and describe other choices as needed.  Admin. Rec., Vol.
I, at pp. 962, 970-72.   The Hovems participated in the annual
meetings and discussions about Per's transition and agreed every
year except the last with the recommendations.[63]  Admin. Rec., Vol.
I, at pp. 959, 963.   While KISD admits that it is true that KISD
uses a transition plan for all special education students because
it helps to ensure that all required components are consistently
addressed.   The Plan does have Per's name on it and it was
developed by a group of individuals with unique knowledge of Per's
needs, for a student graduating under the State's rigorous
"Recommended" graduation plan, who was expected to achieve
competitive full time employment with natural supports from family
and friends, who was planning to attend a four-year university, and
who would not need any support to live independently after
graduation.  Admin. Rec., Vol. I, at pp. 970-72, 962.  In addition,
the three-page transition plan is only one part of the thirty-page
IEP.   Many additional recommendations, details and supports
specific to Per are included in other parts of the IEP.  *Id.* at pp.
943-69.   Nothing in one part of the IEP need be repeated in

---

[63] KISD points out that at least one of Per's parents attended
every ARD Committee meeting and there is no evidence that they were
not active participants.   In fact, they first suggested that he
should attend a general education English/Language Arts class
instead of a special education course as was provided up to that
time.   And Per was successful; there is no evidence that any
alleged procedural violation had a detrimental impact on any aspect
of Per's education.

another.  20 U.S.C. § 1414(d)(1)(A)(ii)(II).  *See also Lessard v.*
*Wilton-Lyndeborough Coop. Sch. Dist.*, 518 F.3d 18, 25, 30 (1st Cir.
2008).

The Hovems' argument that requiring Per to participate in all
general education classes and achieve the same level of mastery on
all State curriculum goals as any non-disabled person is not an
individualized decision compliant with the IDEA is also wrong.  The
ARD Committee's decision to do so is an individualized decision
fully    compliant    with    the    statute.    34    C.F.R.    §
300.39(b)(3)(defining "specially designed instruction" to require
modifications   to   the   content,   methodology   or   delivery   of
instruction only as appropriate to address the needs of the child
and to "ensure access of the child to the general curriculum so
that   the   child   can   meet   the   educational   standards   within   the
jurisdiction of the public agency that apply to all children").

In addition, contrary to the Hovems' complaint that the IEP
did not address Per failure on the TAKS test, KISD points out that
at   the   first   ARD   Committee   meeting   after   Per   failed   the   written
portion   of   the   English/Language   Arts   TAKS   test   the   Committee
addressed   the   question.    Given   the   facts   that   he   had   met   the
State's expectations at th 10th grade level ELA TAKS the year
before, that he was receiving instruction and passing his grade-
level   English/Language   Arts   curriculum,   he   was   receiving   daily
remedial   writing   instruction   specifically   geared   to   the   TAKS

-100-

writing test in a Practical Writing course, and he would retake the test with the accommodation of a word processor, the ARD Committee remained optimistic.    That Per did not achieve every goal set by the ARD Committee does not equate to an inappropriate educational plan. *J.K.*, 400 F. Supp. 2d at 995 (citing *Rowley* to explain that a "FAPE does not guarantee a particular outcome").

KISD responds to the Per's charge that it did not have an IEP in place at the beginning of the 2007-08 school year by noting that this allegation is barred because it was not raised at the administrative hearing; even if it had been, it is contradicted by the record (Admin. Rec., Vol. I at p, 979 (the IEP developed on September 13, 2006 is in effect until September 12, 2007; p. 943 (ARD Committee met again in Sept. 2007); *see also* 20 U.S.C. § 1414(d)(4)(A)(requiring IEPs to be reviewed at least annually).

Finally, the record shows that Per did receive a copy of his Procedural Safeguards. Admin. Rec., Vol. I at p. 973. Moreover Per and his parents agreed with the recommendations of the ARD Committee. *Id.* at 994.

Even if KISD had violated procedure, the Hovems offer no evidence that such violation impeded his right to a FAPE, significantly impeded his parents' ability to participate in the development of the IEPs or deprived him of an educational benefit. 34 C.F.R. § 300.513(2).    It was very reasonable for the ARD

Committee to believe that Per's many successes indicated that he was on track and capable of meeting the goals it set.

Regarding the reimbursement ordered by the Hearing Officer, KISD rejects the Hovems' argument that they are entitled to the award because the Hearing officer is authorized to award reimbursement and equitable relief and because they have standing. KISD contends that any right they have arises exclusively under the IDEA; because Per reached the age of majority, his parents no longer have any rights under the IDEA, and therefore they have no right to reimbursement.  19 Admin. Code § 89.1049(a)(transferring IDEA rights to adult student).  Even if KISD failed to provide Per with a FAPE, his parents are not entitled to the ordered reimbursement.

Even if the parents did have standing, there is no legal basis for ordering reimbursement of the residential portion of the private school costs, contends KISD.

Last of all KISD argues that the applicable limitations period is one year for all requests for due process hearings filed in Texas.  19 Tex. Admin. Code § 89.1049 and Tex. Educ. Code § 29.017. The specific rights granted to students with disabilities and their parents under the IDEA, to which they do not have to consent, come with express limitations periods.  Statutes of limitations are commonly applied to all causes of action, and there is nothing unfair or absurd about applying one here.  Nor, as the Hovems

argue, can the Hearing Officer ignore the express limitations period. Though the Hearing Officer awarded two years of reimbursement in the erroneous determination that a two-year limitations applied, so the award must be overturned. Admin. Rec., Vol. I, at pp. 19 and 27.

### Hovems' Surreply (#44)

Agreeing with the Hearing Officer that the transitional services plan developed for Per was procedurally and substantively deficient and his IEP failed to provide him with a FAPE and "academic benefit," the Hovems try to distinguish the extensive and substantial efforts made by the school district for a student with a disability in *J.L.*, 592 F.3d 938, who also had a writing disability and was sent to Landmark School, with what they see as the inadequate effort to address Per's unique and individualized needs here. The Fifth Circuit has refined the "some educational benefit" standard to require students to achieve "meaningful benefit" or "meaningful progress" in the areas where their disability affects their education. *Bobby R.*, 200 F.3d at 347. Other courts of appeals look at a student's potential and ability to determine whether he has progressed and received educational benefit. *Ridgewood Bd. of Educ. v. N.E.*, 172 F.3d 238, 247 (3d Cir. 1999)(adding that when a student displays considerable intellectual potential, like Per, "a great deal more than a negligible benefit" is required). They argue that if a school

modifies a grade, as KISD proposed to do with the failed TAKS test, it loses its validity as a true measure of benefit or progress. The Hovems reiterate their contention that Per's IEPs were never changed since 2006, KISD never addressed his problems after any of the three times he failed the TAKS test, and his program was the same one given to non-disabled students.

The Hovems further complain that KISD has failed to address the alternative legal theories they put forth upon which reimbursement could be made. They reiterate that the Hearing Officer correctly ordered reimbursement pursuant to the equitable authority granted to him in the IDEA. Moreover under KISD's position, no student close to age eighteen would ever complain that a school's IEP was deficient and could not go to a private educational environment unless he or his parents were wealthy, which would be inconsistent with the statute's mandate that his education be provided at public expense. As for its opposition to reimbursement of Per's residential expenses at Landmark, KISD provides no legal authority. Moreover the argument is erroneous because the Hearing Officer has the authority to order reimbursement of a residential portion of private placement. 20 U.S.C. §§ 1412(a)(1) and (10)(B). *See also Michael Z.*, 580 F.3d at 606-07 (where placement in a residential program is necessary to provide special education and related services to a child with a disability, the program, including room and board, must be at no

cost to the parents).    Finally, the Hovems maintain that the
Hearing Officer's decision regarding the two-year limitations
period was correct.

### KISD's Supplement (#47)

As noted, the Fifth Circuit rejected the "inextricably
intertwined test for reimbursement of residential expenses incurred
in the private placement of a disabled student not receiving a FAPE
and instead applied a new test:  for a residential placement to be
appropriate under IDEA, the placement must be 1) essential in order
for the disabled child to receive a meaningful educational benefit
and 2) primarily oriented toward enabling the child to obtain an
education. *Michael Z.*, 580 F.3d at 299.  *See also* 34 C.F.R. §
300.104 ("If placement in a public or private residential program
is necessary to provide special education and related services to
a child with a disability, the program, including non-medical care
and room and board, must be at no cost to the parents of the
child.").  KISD still argues that there is no evidence that any
aspect of the residential program at Landmark was necessary to
enable Per to receive an educational benefit.  Per's mother
testified that she paid for the residential portion of the private
school because she wanted Per to experience the dormitory life like
other graduating students who were going off to college.  Admin.
Rec. Vol. II at p. 624, ll. 17-23.  Per's expert, Dr. Shumsky,
testified that the residential portion of Landmark was not

-105-

necessary to ensure that he received an educational benefit from the Landmark placement and that two high schools in Houston implemented the same methodology that he thought Per needed. *Id.* at p. 214. Therefore, even if the Court finds that KISD denied Per a FAPE, Per is not entitled to reimbursement of the residential program expenses because not offered by Landmark's residential program is essential to Per's educational progress.

### Hovems' Response to KISD's Supplement (#52)

The Hovems maintain that the educational services provided by the Landmark School are essential for Per. The Hearing Officer determined that Landmark School specifically provided educational services for highly intelligent children, such as Per, who have language disabilities. Admin. Rec. Vol. II, pp. 179, 335. It uses a particular, teaching method (LindaMood-Bell), which employs a multi-sensory approach to problems of auditory processing of language which is helpful to Per. Admin. Rec. Vol. II, pp. 138, 311, 366-67. It also provides daily, one-on-one tutorial sessions to work on Per's disability. Admin. Rec., Vol. II, pp. 311-12. The classes at Landmark are highly structured so that language skills are exercised during the entire course materials. Admin. Rec., Vol. I, p. 745; *id.*, Vol. II, pp. 347-48. The program is highly individualized to Per's needs. Admin. Rec., Vol. II, pp. 333, 343-44.

As for Landmark School's residential program, they argue that

that KISD took remarks made by Dr. Shumsky out of context, and insist that Dr. Shumsky repeatedly explained that Per could not obtain the skills he needed at a local school (Admin. Rec., Vol. I, p. 162), and that although two schools in the Houston area provided the LindaMood-Bell program, neither was appropriate because neither could provide the level of services Per required.  Admin. Rec., Vol. I, pp. 162, 215, 182, 183.  Dr. Shumsky testified that there were no public schools that could provide Per the individualized educational services that he received at the Landmark School. Admin. Rec., Vol. I, p. 217.  KISD did not contest any of these comments or present any evidence or witnesses to testify about the appropriateness of any private or public schools in the Houston area.  Nor did anyone from KISD investigate the Landmark School to determine whether it was appropriate for Per.  KISD also has not presented any evidence challenging the appropriateness of Per's 2008 summer program at the Landmark School, where he made good progress.  Admin. Rec., Vol. II, pp. 328-30, 368-70; *id.*, Vol. I, pp. 766-74, 830.

### Court's Decision

As a threshold matter, the Court finds that KISD materially misrepresents the Hearing Officer's decision and the Hovems' arguments.  For example the Hearing Officer did not find, nor did the Hovems argue, that KISD denied Per a FAPE because KISD failed to develop Peer's writing skills to a level that would guarantee

him success in college or to the extent that college would not be difficult for him.  Nor did the Hearing Officer conclude, nor did the Hovems argue, that the Transition Plan, purportedly developed each year since Per was fourteen, was flawed because it did not equip Per for success in college by preparing him to take class notes or pass essay exams.  Nor did the Hovems argue that KISD was required to develop a transition plan that would cure Per's writing disabilities or ensure that he passed the TAKS test.

With regard to the Texas one-year statute of limitations, the Hovems filed their Original Complain and Request for Special Education Due Process Hearing on June 26, 2008, so the Court must determine that they knew or should have known of the basis of their complaint within the previous year.  The Court finds that Per and the Hovems became aware that after years of assurance by the ARD Committee that Per was progressing because he was passing classes and TAKS tests, that Per could not fill out college applications, that extensive testing was sought by his family and revealed Per's actual low level of written expression and that he was functioning significantly below his expected age or grade norms in basic skills relating to written expression, that research into alternative schools, especially Landmark School, revealed methods and opportunities previously unknown to him and precluded by his unchanging IEPs, that his English teacher awakened his family to the severity of his disability, and that Per, himself, called an

ARD Committee meeting to assert his belief that he could not function in college or at a job with his current skills.

This Court affirms the Hearing Officer's findings from a preponderance of the evidence rejecting the Hovems' contentions that KISD failed to comply with certain IDEA procedural requirements:  that KISD failed provide Per with highly qualified teachers or that it did not hire, train or supervise staff capable of meeting Per's unique needs, that Per needed non-academic services such as counseling and social work services, that any of the ARD Committee members had collaborated prior to the ARD Committee meetings to predetermine the child's educational plan, and that the district failed to provide the Hovems with timely and objectively verifiable and understandable reports on Per's IEP goals.

A central goal of the IDEA is to ensure that children with disabilities receive a FAPE that "emphasizes *special education and related services designed to meet their unique needs and prepare them for further education, employment, and independent living.*" *Juan P.*, 582 F.3d at 583 [emphasis added by the Court].  The focus is on the special education services' targeting the student's disability and/or weakness, not his normal abilities or strengths. The FAPE must provide educational instruction designed to meet the disabled child's unique needs, supported by services necessary for the child to benefit from the instruction.  KISD appears to turn

that standard on its head in arguing that because Per did well in all other areas than that in which his disability lies, his IEP was adequate even though it was not designed nor modified when shown to be ineffective to focus on that unique weakness/need. KISD determined that Per was eligible for special education services under the IDEA; it cannot excuse a failure to provided special related services addressing his unique needs merely because he is highly intelligent and ahead of many regular education students in his areas of strength. The Court agrees with the Hearing Officer that Per's later IEPs in 2006-08, unchanged for three years and viewed against his history of continuing and severe deficiencies in written expression and his inability to pass the written TAKS test during his last two years in the district, were not reasonably calculated to enable him to receive educational benefit. *Rowley*, 458 U.S. at 206-07. While KISD was clearly not required to cure or remediate Per's learning disability, it was required to address his learning disability. Instead the record supports a finding that KISD ignored Per's area of weakness and even chose to obscure it by highlighting Per's success in areas not impacted by his learning disability. While the Court agrees that KISD did not have to provide Per with the best possible education or one that would maximize his educational potential (i*d., citing Michael F.*, 118

F.3d at 247),[64] "[n]evertheless, the educational benefit to which the Act refers and to which an IEP must be geared cannot be a mere modicum or *de minimis*; rather, an IEP must be likely to produce progress, not regression or trivial educational advancement" and to provide Per with "meaningful" educational benefit.   *Juan P.*, 582 F.3d at 583.

Applying the four factors established in *Michael F.* to determine whether Per's unchanging IEPs were reasonably calculated substantively to provide Per with an educational benefit, this Court finds just one in support of KISD's position, and that only partially, in that KISD did observe the least restrictive environment requirement of the IDEA when Per's ARD Committee mainstreamed Per in all classes beginning in the 2006-07 school year.   But

> the IDEA mandates that a child be placed in the least restrictive environment in which the child can achieve an *appropriate* education.   *See* 20 U.S.C. § 1412(a)(5)(A).

---

[64] The Court acknowledges that some of the witnesses, such as those who did the testing, including Dr. Rebecca Johnson (transcript at 247, 251) or the teachers at Landmark School, including Brett Hall (transcript at 346) were aiming to maximize Per's educational potential, but Per's parents were not holding the school district to that standard.   *See, e.g.,* Mrs. Hovem's testimony during the due process hearing after complaining that for eight years the school district had misled the family about what Per's actual status was, Transcript at 559:

> We are not asking for the most optimal, maximized potential that you keep trying to drag out of witnesses. We were asking that he function at a 6th grade level.   We don't know if he can do that, but we want to have a chance to try.

> The IDEA's strong preference in favor of mainstreaming must "be weighed in tandem with the Act's principal goal of ensuring that the public schools provide [disabled] children with a free appropriate public education." *Daniel R.R.*, 874 F.2d [at] 1044-45, 1048.

*Juan P.*, 582 F.3d at 586. As the Hearing Officer found and as will be discussed, the preponderance of evidence in the record demonstrates that KISD did not provide Per with a FAPE.

As emphasized by the Hearing Officer and supported by the record, regarding the first factor, Per's IEP was not sufficiently individualized on the basis of his assessment and performance to meet his needs: the ARD Committee determined that he was to receive the same education and meet the same standards as regular education students without any variation. For special services he was given a portable speller and access to a computer in the classroom, which his ARD Committee knew he was not using as early as 2005.[65] The ARD Committee made no changes over the next three years to see if it could get him to use them or employ other means to assist him.[66] Moreover despite KISD's insistence that Per was

---

[65] As noted, despite clear references in his ARD Committee documents to reports from his teachers that he was not using the speller in class, Occupational Therapist Dawn McDonald claimed that she did not know until Per was in eleventh grade that he was not using it. Due Process Hearing Transcript at 396. Even then she stated that the choice was up to him and there was nothing she could do. *Id.*. Yet when questioned further, she said if Per had told her, "I would have looked . . . to see if there was any other way we could assist him, finding his words easier, another device maybe." *Id.* at 415-16.

[66] Indeed it is telling that the person at KISD who brought Per's plight to the attention of the Hovems and who made a personal

-112-

successfully mainstreamed and therefore provided with a FAPE, testimony repeatedly showed that he was not actually held to the same standards as his regular-education classmates:  his teachers often excused him from requirements they imposed on his classmates in ways that allowed them to circumvent having to continuously seek and try individualized methods that might assist him in dealing with his disability.  His teachers admitted he often did not hand in his homework, they permitted him to answer questions orally when they could not read his handwriting, and they told him to finish, polish, and type written assignments at home, where he was helped by his mother and brother.  As pointed out by the Hovems, without meeting ARD Committee procedures for such an exception, KISD waived passage of the written TAKS test, which Per failed three times during his last two years in KISD, as a requirement for him to graduate, rather than make an individualized effort to help him pass it.  There was testimony indicating that his 2008 evaluation by KISD evidenced no progress over his 2005 evaluation (Petitioner's Exs. 12, 7).  Shumsky's testimony at Due Process

---

effort to help him was not a special education teacher or professional, but his regular-education English teacher, Lauri Marek.  In the spring of 2008, Marek realized from the first assignment Per had done totally in class that Per had a severe writing/communication problem, called his parents to inform them and get their help, and on her own initiative in May 2008 got the Kurzweil computer program, which, though it ultimately proved unsuccessful, Pamela Bass had recommended in December 2007 and the ARD Committee knew of that recommendation in February 2008, but made no effort to obtain it for Per.  Due Process Hearing Transcript at 571.

Hearing, Transcript at 154-55.  Moreover, while KISD argues that
Per passed all of his classes and would have graduated with his
class had he taken the economics course, his test evaluations in
the spring of 2008 make KISD's claims that it provided him with an
educational benefit are highly suspect.  As noted, in Per's
Admission Screening--Test Results dated March 28, 2008, while Per's
reading comprehension score was high, 142, Per performed at a 5.1
grade equivalent in word identification, 2.0 grade in word attack,
5th grade and four months in reading, second grade fourth month in
accuracy of reading, and third grade seventh month in the fluency
of reading, while his score for word attack (dealing with phonetic
decoding) was in the 1% level.  Admin. Rec., Vol. I, Petitioners'
Ex. 11 at p. 737.  Even when Per, himself, called an ARD meeting in
May 2008 to insist that he was not ready to graduate, his ARD
Committee simply responded that he had received a FAPE, that he was
ready to graduate, and in essence, in a final "passing the buck,"
told him that colleges and universities receiving federal funds
were required to have programs to assist those with learning
disabilities.  They also denied his request for reimbursement for
placement in the Landmark School without investigating it.

Moreover, within his last deficient IEPs, Per's transition
plan, if indeed there was one, was not individualized by any
objective, measurable goals that are result-oriented nor
identification of transition services to meet his needs after high

school.   This Court agrees with the Hearing Officer that KISD
failed to provide an appropriate Transition Plan for Per.   Two
documents, one dated 9/13/06 (Petitioner's Ex. 8 at 664) and
another dated 9/14/07 (Ex. 9 at 697), constitute Per's Transition
Services for his last two years.   They are identical and indicate
broadly and abstractly through a couple of checked boxes that he
needs only Occupational Therapy and Assistive technology.   During
the Due Process Hearing, Transcript at 530-34, Per was asked what
he needed to plan for his life post-secondary school; unlike the
vague Transition Services documents that offered nothing more than
his IEP accommodations for the past few years, he identified
specifically that he needed someone to help him find a college with
a good assistive program for the learning disabled and to locate
private tutoring outside college, and ideally a personal assistant
to take notes for him.   Per also testified that he had never met
with a guidance counselor about post-school transition planning.
Due Process Hearing Transcript at 504-05.   KISD presented no
evidence to the contrary.

The third factor in *Michael F.*, services provided in a
coordinated and collaborative manner by key stakeholders, also
fails under scrutiny.   To participate and collaborate meaningfully,
one must understand what is going on.   The Hovems were not trained
in special education, but relied on those who were.   Although for
years the ARD Committee and the Hovems worked together on Per's

IEPs in a seemingly coordinated and collaborative manner, during which time the family had regularly pointed out their concerns about Per's writing and reading difficulties, Mrs. Hovem stated that the Hovems were not informed, indeed were misled, about Per's actual level of ability until his senior year. Dr. Rosenburg testified that her staff was not trying to mislead the Hovems about Per's scores, but conceded that their evaluation reports do not have grade equivalence or percentile scores.[67]  Due Process Hearing Transcript at 666-67, 671.  In either event, given persistent reassurances of progress by his ARD Committee and KISD's focus on his passing grades, the Hovems were not aware of the low levels at which he was functioning.  In his senior year Per and his parents realized that he was unable to complete applications when he looked into colleges.  When the Hovems arranged for him to be extensively tested and were given the results, with grade equivalencies, in the Spring of 2008, they discovered how minimal his written expression skills actually were.  They also discovered from Marek's call that his English teacher was deeply concerned about his deficiencies. In addition they learned in the few months before the due process hearing in December 2008 what a competent IEP under the IDEA should

---

[67] Dr. Rosenburg explained that they were not included because such measurements are often exploited or distorted.  Percentiles are a statistical measure of rank, are relative only to the others taking a particular test.  Grades are  far more subjective; curricula differ and what is defined by a grade can differ.  *Id.* at 666.

-116-

contain and what is required of a school district to design an
educational program for a child with learning disabilities, and
they realized that Per's IEPs lacked individualized essential,
measurable goals and objectives.  Due Process Hearing Transcript at
56-61.  Mrs. Hovem testified during the due process hearing,
transcript at 556-57:

> I feel strongly if we knew actual percentiles and grade
> equivalencies we would be so much more involved four
> years ago.  You know, it's--To us, you know it was like
> a smoke screen got created in that we--we had so many
> ARDs with so many people told [*sic*] us how great P. is,
> how bright P. is, how good looking P. is, and how--what
> an amazing feat for a special ed kid to be in general ed,
> and what a novelty it was when the general counselor got
> to sit in on an ARD. . . .  And we, as parents, were
> praised for how involved we were, what a great kid, how
> respectful, you know.  So for us, we felt like there was
> a show going on.  That the illusion is wonderful, just
> buy into it.  You know the grades are there.  He is--he
> is performing well.  He is going to get a diploma, and
> he's going to be fine.  We had no feedback that was
> concrete to help us be participants in this,  If we could
> go back--You guys robbed us of eight years to help our
> kid.

*See id.* at 60506.

The last factor, demonstration of positive academic and non-
academic benefits, revives Mrs. Hovem's analogy of KISD's arguments
to a smoke screen.  The Fifth Circuit demands that the "IEP must be
'likely to produce progress, not regression or trivial educational
advancement,'" i.e., "the educational benefit that an IEP is
designed to achieve must be 'meaningful.'"  *Bobby R.*, 200 F.3d at
347.  It should have provided Per with not just "'a basic floor of
opportunity,'" but one that "'consists of access to specialized

instruction and related services' individually designed to provide"
him with educational benefit that is more than "*de minimis*." *Juan
P.*, 582 F.3d at 590.  Per's written work, of which there are
numerous examples, does not show any significant improvement while
he attended KISD schools.  In contrast Per's documented progress
within a short time at the Landmark School, where he does not use
a portable speller,[68] demonstrates that significant educational
benefits were possible when an individualized program addressing
Per's learning disability was implemented.  Documents of his
handwriting at Landmark School reflect significant improvement.
Moreover some of Landmark School's solutions for addressing Per's
disability discovered through its individualized program, such as
recognizing that Per was more comfortable and his writing far more
legible when he wrote in cursive, were simple and inexpensive.  As
noted, in its efforts to push Per through the system, KISD
circumvented goals, objectives, and standards of measuring progress
and left Per's IEPs unchanged despite knowledge that what was
originally proposed was not working.  While highlighting his
passage of classes and TAKS tests, KISD downplayed the crucial
impact on an individual's life of an inability to write in order to
communicate ideas, receive messages, prepare lists, etc. inevitably
plays in a person's ability to function in life.  As the Hearing

---

[68] Due Process Hearing Transcript at 485.

Officer concluded, an examination of Fifth Circuit IDEA cases[69] indicates that a school district's obligation to provide a FAPE is ongoing and requires alterations, modifications and regular, careful review by the ARD Committee when an IEP is not effective; by comparison, KISD's effort to provide Per with a FAPE was *de minimis*. Although several professionals who tested Per or represented Landmark School talked about aiming to achieve optimal results given his abilities, a standard well above that required of school districts by the IDEA, Mrs. Hovem testified convincingly at the Due Process Hearing that such was not her goal: "We are not asking for the most optimal maximized potential that you keep trying to drag out of witnesses. We are asking that he can function at a sixth grade level. We want to--We don't even know if he can do that, but we want to have the chance to try, just the chance to see, to prove to ourselves." Hearing Transcript at 559.

In sum, the Court finds that Peer's IEP at KISD was not reasonably calculated to provide him with some "meaningful" educational benefit, with progress which is neither trivial or de minimis, and ultimately a FAPE "tailored to the child's unique needs by" means of an appropriate IEP. *Michael Z.*, 580 F.3d at 292.

---

[69] *See, e.g., Michael F.*, 118 F.3d 245; *Bobby R.*, 200 F.3d 341; *Adam J.,* 328 F.3d 804;

Where parents unilaterally remove their disabled child from the local school system, the parents may obtain reimbursement for their private placement only if they show that the school district's placement was inappropriate and the alternative placement was appropriate. *Burlington*, 471 U.S. at 373-74. Because it agrees with the Hearing Officer Per's IEP at KISD was inappropriate, the Court reaches the issue of reimbursement or the appropriateness of Landmark's program. The Court also agrees with the Hearing Officer for the reasons he stated and the evidence in the record that Landmark School was an appropriate academic placement for Per. *See, e.g.,* testimony during the Due Process Hearing of Marie Mirandi (at 367-82), Brett Hall (at 311-40).

Nevertheless, while Per's placement at Landmark School, with its Lindamood-Bell methodology, for its educational instruction was appropriate, the Court must examine whether it satisfies the Fifth Circuit test for reimbursement of the residential expenses, as opposed to educational expenses:  the placement "must be 1) essential in order for the disabled child to receive a meaningful educational benefit, and 2) primarily oriented toward enabling the child to obtain an education. *Michael Z*, 580 F.3d at 299. The Fifth Circuit explained about the first prong, "if a child is able to receive an educational benefit without the residential placement, even if the placement is helpful to a child's education,

-120-

the school is not required to pay for it under the IDEA.  *Id.* at 300.

The evidence presented by the Hovems, which constitutes the only evidence in the record regarding alternative placements, demonstrates that Landmark School is an appropriate placement for learning disabled students with high intelligence quotas, like Per.

However, the Fifth Circuit made clear that to recoup residential expenses under the IDEA, if the child

> is able to receive an educational benefit without the residential placement, even if the placement is helpful to a child's education, the school is not required to pay for it under IDEA.  This formulation of the test aligns with the goal of the IDEA: to enable a disabled child to receive a meaningful educational benefit.  Moreover, this prong is directly tied to IDEA's implementing regulations, which state that "[i]f placement in a public or private residential program is necessary to provide special education and related services to a child with a disability, the program, including non-medical care and room and board, must be at no cost to the parents of the child."  34 C.F.R. § 300.302.

*Michael Z.*, 580 F.3d at 300.  The evidence in the record demonstrates that the residential placement of at Landmark School was helpful, but there is no evidence that it was essential for Per to obtain a meaningful educational benefit.  That Mrs. Hovem wanted Per to experience dormitory life like his fellow students at KISD who were going on to college is not an adequate reason to impose that expense on the public school district and ultimately on its taxpayers.  Moreover Mrs. Hovem testified that she and her husband had gone to school in the Boston area and had many friends there

who could function as family for Per;  it is not unreasonable to
assume she could arrange for Per to live with one while he attended
Landmark School.   With regard to the second prong of the Fifth
Circuit's test, reimbursement for services depends upon whether the
residential placement was primarily oriented toward enabling the
child to obtain an education, the Fifth Circuit agreed with the
Seventh Circuit, focusing "on whether the private residential
placement is 'primarily educational,'" because services oriented
primarily toward enabling a student to obtain an education are
"related services" within the meaning of the IDEA,[70] while services
enabling the child to engage in non-educational activities are not.
*Michael Z*, 580 F,3d at 298-99, *citing Dale M v. Bd. of Educ. of
Bradley-Bourbonnais High Sch. Dist. No. 307*, 237 F.3d 813, 817 (7th
Cir. 2001).   The Landmark Program for resident students, Per in
particular, as evidenced by the testimony and documentary evidence
admitted at the hearing, was oriented primarily toward educational
activities.   Educational instruction beyond daily one-on-one
tutoring and small classes continued in evening study halls,
staffed with teachers to provide individual help, and on weekends.
Nevertheless, because the Hovems have not shown that the
residential placement was essential for providing Per with an
educational benefit, the Court concludes that KISD should not have
to pay for that aspect.   Nor does the Court find any evidence to

---

[70] "Related services" are defined in 20 U.S.C. § 1401(26)(A):

substantiate the Hovems' argument that KISD waived its right to contest the residential expense because it did not challenge the Hovems' decision to send Per, and their expense, to the 2008 summer program at Landmark School.  The ARD Committee had objected earlier to the Hovems' request that it reimburse them for placement at Landmark during the regular school term.

Accordingly the Court hereby AFFIRMS the decision of the Hearing Officer to the extent indicated above and ORDERS that KISD's motion for summary judgment (#17) is DENIED  and Per Hovem's motion for judgment upon the administrative record (#39) is GRANTED with respect (1) to KISD's failure to provide Per with a FAPE and (2) to reimbursement for educational expenses, but not for residential expenses, incurred by Per at Landmark School.

Counsel for Per Hovem shall file within twenty days an appropriate motion for attorney's fees and an amended, updated request for reimbursement due for Per's educational expenses only at Landmark School for 2008-09 and 2009-10 school years.  KISD shall file a response within twenty days of receiving the new

motions.

      **SIGNED** at Houston, Texas, this 27th day of September , 2010.

_____
          MELINDA HARMON
   UNITED STATES DISTRICT JUDGE

KISD has argued that the Hovems were asking the Hearing Officer to focus on Per's one areas of weakness to the exclusion of his areas of strength.[71]  The school district in fact was ignoring that area of continuing weakness, Per's learning disability, and relied on the highly intelligent student's good scores in other areas unaffected by that disability to obscure the fact that over the years KISD was not providing "a 'free appropriate public education that emphasizes special education and related services designed to meet [Per's] unique needs and prepare [him] for further education, employment, and independent living.'" *Juan P.*, 582 F.3d at 583, *quoting* 20 U.S.C. § 1400(d)(1)(A)).  Despite clear and continuing evidence that Per did not use KISD's accommodations, i.e., the portable speller and access to a computer in class, to meet Per's needs and that these accommodations were therefore ineffective, the ARD Committees did not address these inadequacies and Per's IEPs remained essentially unchanged.  In the last two years there were no goals or objectives in spelling or written expression for Per.

_____

[71] Transcript of Due Process Hearing, Vol. II at p. 27.